**SALEM TOWNE APARTMENTS, INC.,**
**Plaintiff,**

v.

**McDANIEL & SONS ROOFING COMPANY, Defendant.**

**Civ. A. No. 762.**

United States District Court,
E. D. North Carolina,
New Bern Division.

March 11, 1970.

Supplemental Opinion Aug. 4, 1970.

**908**

Robert L. Emanuel, Emanuel & Emanuel, Raleigh, N. C., for plaintiff.

John V. Hunter, III, Raleigh, N. C., for defendant McDaniel & Sons Roofing Co.

Eugene C. Brooks, III, Durham, N. C., for defendant Lloyd A. Fry Roofing Co.

C. R. Wheatly, Jr., Wheatly & Mason, Beaufort, N. C., for defendants A. B. Roberts & Bill Price.

## MEMORANDUM OPINION

MacKENZIE, District Judge.

On its apartment complex of 16 buildings, 153 units, in Winston-Salem, North Carolina, the plaintiff contracted with the defendant, McDaniel & Sons Roofing Company, for the roof installation. From a group of samples presented by the defendant, McDaniel & Sons, the plaintiff chose a black shingle manufactured by the defendant, Lloyd A. Fry Roofing Company, and distributed by the third-party defendant, Southeastern Roofing Company.

Utilizing the shingles so selected, McDaniel had completed the roofs on two of the apartment buildings by late March, 1967, when it was directed by Salem Towne to stop work because patterns of discoloration appeared under certain light conditions on the roofs installed. The displeasure of Salem Towne was made known to Fry, the roofing manufacturer and Fry issued a letter dated March 28, 1967, intended, says Fry, to persuade Salem Towne that the color variation was temporary and concluded with these words, "rest assured that if we are wrong in these assertions, the responsibility will be ours to correct." The letter was addressed to McDaniel & Sons, but for delivery to Salem Towne Apartments, Inc. To be certain that these assurances from Fry were not intended to extend only to the two buildings then erected, Salem Towne requested, and Fry, by letter of April 7th, for delivery to Salem Towne Apartments, restated that their assurances would apply to the entire project.

Upon receiving these letters, Salem Towne directed McDaniel to proceed, using the Fry shingles. The project was completed and delivered. McDaniel & Sons Roofing Company was paid.

Salem Towne concedes that the roof is completely functional; that there is nothing wrong with the installation of the roof; and agrees that its only objection is the mottled appearance.

Since the discoloration, originally noted, continued even after the time in which Fry had suggested that it would cure itself, Salem Towne brings suit against its sub-contractor, McDaniel & Sons Roofing Company and Lloyd A. Fry Roofing Company. In turn, McDaniel & Sons has brought in the distributor to it of the Fry products, Southeastern Roofing Company as a third-party defendant.

Succinctly, it can be stated that there is very little disagreement as to the facts of this case, and the matter for resolution is the measure of damage, if any, and the evidence before this Court available for computing such damages.

## FINDINGS OF FACT

1. Salem Towne Apartments, Inc., contracted with McDaniel & Sons Roofing Company, Inc., to provide and install roofing on its 16 building project at Winston-Salem, North Carolina, for $19,500.00, the contract being dated January 24, 1967. From samples proffered by McDaniel & Sons Roofing Company, Salem Towne Apartments, Inc. directed that 235 pound, 3 tab strip, jet colored shingles manufactured by Fry Roofing Company, be installed on the project.

2. Some 200 squares of shingles were delivered directly from Fry Roofing to the project in early March, 1967 and the roof installation proceeded. When the installation of the shingles on the first two buildings had been virtually completed, a color variation in the black roof became evident and Salem Towne ordered the work stopped.

3. On March 28, 1967, Fry Roofing Company caused a letter to be issued, in duplicate, for presentation to Salem Towne Apartments, Inc., which, according to an authorized official of Fry Roofing, was for the purpose of persuading Salem Towne to continue the use of the Fry product. The letter read as follows:

"Mr. A. B. Roberts
Southeastern Roofing Distributors
Morehead City, N. C.

Re: McDaniel Roofing Co.
c/o – Salem Town Apartments
Winston Salem, N. C.

"Dear Mr. Roberts:

"This will reply to our conversation in my office last Friday, and in particular, to the complaint registered against the appearance of the color of our shingles recently applied on subject buildings.

"In checking our records I find that the 200 squares of 235, Jet colored shingles, shipped March 10th, were manufactured on the same date and loaded straight on the truck,—thus assuring us that granules were uniform in color.

"I happened to be in Winston Salem last Thursday on another matter, and while passing through the general area of this project, noticed the color variation on several of the buildings. While this would appear disturbing to most any one, am satisfied that this appearance is only temporary and that noticeable improvements could be observed with each passing week.

"This color variation is due to what we refer to as a 'dusting' condition. That is, the dusting applied to the back side of each shingle,—a process to avoid shingles sticking in the bundles,—and some of the dust particles are clinging to the granule surface.

"In this instance we have a genuine slate granule surface,—a product from Virginia,—and shipped to us in an 'oiled' condition.

"With warmer weather soon to expect, we can depend on one hot summer sun to dry out the 'oils' and good hard rains to wash down the dusting. This end result will be the restoration of the slate granules original color,—and appearance of the roof well beyond the point of objection.

"Rest assured that if we are wrong in these assertions, the responsibility will be ours to correct. As to length of time, we believe that ninety (90) days will be adequate and that your good customer will be patient with us.

"With kindest regards.

Very truly yours,

LLOYD A. FRY ROOFING COMPANY

/s/ Walter Edwards
Walter Edwards, Plant Manager."

4. Not being satisfied that the assurances from the letter above noted were intended to cover the entire project, but might be construed to cover only the two buildings then completed, Salem Towne requested that the assurances be made clear as extending to all 16 buildings. Fry Roofing, through a properly authorized official, immediately caused to be issued a second letter under date of April 7, 1967, which was delivered to Salem Towne Apartments, Inc., which letter read as follows:

"Mr. A. B. Roberts
Southeastern Rfg. Dist.
Morehead City, N. C.

Re: McDaniel Rfg. Co.
c/o Salem Town Apartments
Winston Salem, N. C.

"Dear Mr. Roberts:

"Regarding my letter of March 28th on subject matter, we received phone call from McDaniel's requesting that we modify the second paragraph.

"His request was that our letter speaks for the entire project and not just limiting to 200 squares—which was the quantity shipped at the time.

"This is to advise that we will be glad to comply with Mr. McDaniel's request, and include our roofing applied throughout the project.

Very truly yours,

LLOYD A. FRY ROOFING COMPANY

/s/ Walter Edwards
Walter Edwards, Plant Manager."

———◆———

5. Upon receipt of the two letters, Salem Towne acknowledges that it directed McDaniel to proceed with the roofing, using the Fry shingles and that it relied upon the Fry assurances.

6. Ultimately, in December 1967 and January 1968, Salem Towne took possession of the project. Its president agrees that the roof is functional and the installation of the shingles was satisfactory, and that his only objection is the continued discoloration presented from certain light reflections on the black roofs of the 16 buildings.

7. Contrary to the assurances of the Fry letters of March 28, 1967 and April 7, 1967, the discoloration has persisted and while somewhat diminished in tone and severity was still apparent when viewed by the Court at Winston-Salem on March 6, 1970.

8. The evidence before the Court is that the project is 100% rented, that it has been since the date of its original occupancy in December, 1967 and that there is a waiting list for apartments.

9. Despite efforts at proving that the discoloration was due to some handling of the shingles by McDaniel on the site, this proof was totally lacking and the Court specifically finds that McDaniel did not improperly stack or otherwise abuse or contribute to the discoloration.

10. Plaintiff, to support its claim that the entire roof must be removed and replaced, offers evidence that the present cost of replacing the roof has risen from its original contract price of

$19,500.00 to $25,000.00. Other credible evidence before the Court would place the cost of correcting the roof condition as low as $14,000.00.

## CONCLUSIONS OF LAW

1. From the facts established, the Court finds that the plaintiff, Salem Towne Apartments, Inc., has prevailed in its claim against Lloyd A. Fry Roofing Company and is entitled to a judgment against that defendant.

■ At the same time, the Court finds that Salem Towne Apartments, Inc. has effectively waived the right of action it seeks to assert against McDaniel & Sons Roofing Company, Inc. and the judgment order entered herein will dismiss the suit against McDaniel & Sons Roofing Company, Inc., and the third-party defendant to McDaniel & Sons, Southeastern Roofing Company.

Mr. Ira Hall, President of Salem Towne Apartments, Inc., has testified that the roofs were properly installed; that they are completely functional; that his only objection is directed to their appearance; that he directed McDaniel & Sons Roofing to complete the project using the Fry materials; that Salem Towne relied upon Fry Roofing Company and the warranties contained in their letters of March 27 and April 7, 1967. Mr. Hall also agrees that Salem Towne Apartments has paid McDaniel & Sons in full (except for a small standard retainage) and that insofar as McDaniel & Sons is concerned, the buildings were accepted in December, 1967 and January, 1968.

By thus instructing McDaniel & Sons to proceed and to apply the Fry Roofing material, in face of and with knowledge of the prior difficulties, thereafter paying McDaniel & Sons under its contract and accepting its work thereunder, Salem Towne Apartments, Inc. waived any right of action it might have had on the matter of discolor. That this is the law in North Carolina is succinctly set forth by the Supreme Court of North Carolina in H. M. Wade Mfg. Co. v. Lefkowitz (1933), 204 N.C. 449, at page 453, 168 S.E. 517 at page 519.

"The law as expounded in this jurisdiction has declared with unbroken uniformity that, nothing else appearing, all prior negotiations are presumed to be merged into a written instrument thereafter executed by the parties, and that the written word so chosen shall abide unless and until the writing is modified, set aside, or rescinded upon grounds deemed by the law as sound and adequate. Notwithstanding, it is also well established that a written contract may be waived or abandoned. The general principles establishing such rights are classified in Bixler v. Britton, 192 N.C. 199, 134 S.E. 488. The doctrine of waiver in proper cases is now as firmly established as the doctrine of the rigidity and inflexibility of the written word. For instance, it is stated in North Carolina Highway Commission v. Rand, 195 N.C. 799, 143 S.E. 851, 856: 'Provision in a contract may be waived.' A waiver has been variously defined and applied. See Makuen v. Elder, 170 N.C. 510, 87 S.E. 334; Allen [Bros.] v. [Raleigh Savings] Bank [& Trust Co.], 180 N.C. 608, 105 S.E. 401. An extensive discussion of the principle is found in Danville Lumber & Manufacturing Co. v. [Gallivan] Building Co., 177 N.C. 103, 97 S.E. 718, 720. The court assembles various definitions of the term, including the following from Herman on Estoppel: 'A waiver takes place where a man dispenses with the performance of something which he has a right to exact. A man may do that not only by saying that he dispenses with it—that he excuses the performance— or he may do it as effectually by conduct which naturally and justly leads the other party to believe that he dispenses with it. There can be no waiver unless so intended by one party, and so understood by the other, or one party has so acted as to mislead the other.' And further: 'The intent to waive may appear as a legal result of

conduct. The actuating motive, or the intention to abandon a right, is generally a matter of inference, to be deduced with more or less certainty from the external and visible acts of the party, and all the accompanying circumstances of the transaction regardless of whether there was an actual or expressed intent to waive, or even if there was an actual but undisclosed intention to the contrary. The decisions declaring intent to be the essence of waiver recognize that the intent may be inferred from a party's conduct.' Moreover, it is further said: 'Since intent is an operation of the mind it should be proven and found as a fact, and is rarely to be inferred as a matter of law.' See, also, Fairbanks, Morse & Co. v. Twin City Supply Co., 170 N.C. 315, 86 S.E. 1051; Edenton-Mackeys Ferry Co. v. Fairbanks-Morse Co., 201 N.C. 485, 160 S.E. 572."

Of particular application to the case at bar, where Salem Towne was immediately apprised of the discoloration in the roofing, stopped McDaniel from proceeding further with it, and then, in reliance of Fry's written warranty, instructed McDaniel to complete the project using the very roofing which was known to be defective, is the language of the Supreme Court in Industrial Lithographic Co. v. Mills, 222·N.C. 516, 519, 23 S.E.2d 913, 914 (1943):

" 'The strict performance of a contract may be waived. A person for whose benefit anything is to be done may, if he pleases, dispense with any part of it, or circumstance in the mode of performance. Where he is present to receive performance, whatever is not exacted is considered as waived, for if objection had been made on the ground of these matters in which the proposed performance was deficient, these might have been supplied at the time, and therefore it is not proper to surprise the party who performed the act, by an objection to the mode of performance, after his vigilance has been disarmed by an apparent acquiescence, for that would be a fraud.' 6 R.C.L., 990; Decamp v. Feay, 5 Serg. & R., Pa., 323, 9 Am.Dec. 372.' Morrison v. Walker, 179 N.C. 587, 103 S.E. 139, 141."

■ 2. Having concluded that the two letters of March 28 and April 7, 1967, written by Fry which sought and received Salem Towne's reliance, were a warranty to Salem Towne, the Court then proceeds to the real issue in this case.

■ What rule of damages is to be applied in North Carolina in a case when roofs constructed on 16 buildings in an apartment project, although completely functional in all respects, are, nevertheless, not of uniform color as the roofing material manufacturer had assured the owner that they would be?

Plaintiff argues that the defendant, Fry Roofing Company, expressly agreed to correct the discoloration of the roof if it did not improve "to a point beyond objection" within ninety (90) days. Plaintiff's claim for a full recovery of the entire cost of a new roof rests upon its assertion that Fry's assurances constitute a provision for damage. There is North Carolina authority for the proposition that parties to a building contract are free to contract as to the measure of damage.

Plaintiff cites Leggette v. Pittman, 268 N.C. 292, 150 S.E.2d 420 (1966). There the Court held that the actual cost of labor and materials necessary to properly secure a floor to make the building conform to the contract was a proper measure of damage. When the contractor by an express written agreement had bound itself to repair, replace, adjust any defects arising within one (1) year at no cost to the owner. The Court said:

"The defendant by his contract and warranty removed himself from those provisions of general law. * * *" 150 S.E.2d 421.

In Leggette, supra, however, the Court acknowledges that it was influenced by

"* * * the circumstances of the case."

Here we only have Fry's assurances that if the appearance of the roof did not improve with exposure "to a point beyond objection," then "the responsibility will be ours to correct". Under these assurances (made after the original defect was discovered), it was contemplated that the further roofing of 14 additional buildings would be undertaken, completed, and be exposed to the weather for a period of time. We cannot conclude that the language of the letters is such an express agreement for damages "* * * under the circumstances of *this* case," as in *Leggette,* supra. Nor do we feel that such language is sufficient to remove this case from the general law of damages in North Carolina and invoke the exception as used in *Leggette,* supra. That case dealt with a wooden floor that cracked and squeaked; was not discovered until after completion; and did not invoke the removal of the floor, nor the extreme action, as here, of the tearing off of perfectly functional roofs on 16 apartment buildings which the plaintiff allowed to be installed after being forewarned of difficulty.

In considering the general law of damages in North Carolina, a leading case concerning damages and building contract is, Robbins v. C. W. Myers Trading Post, Inc., 251 N.C. 663, 111 S.E.2d 884 (1960). In that case, the Court said at 111 S.E.2d 887:

"The fundamental principle which underlies the decisions regarding the measure of damages for defects or omissions in the performance of a building or construction contract is that a party is entitled to have what he contracts for or its equivalent. What the equivalent is depends upon the circumstances of the case. In a majority of jurisdictions, where the defects are such that they may be remedied without the destruction of any substantial part of the benefit which the owner's property has received by reason of the contractor's

work, the equivalent to which the owner is entitled is the cost of making the work conform to the contract. But where, in order to conform the work to the contract requirements, a substantial part of what has been done must be undone, and the contractor has acted in good faith, or the owner has taken possession, the latter is not permitted to recover the cost of making the change, but may recover the difference in value." 9 Am.Jur., Building and Construction Contracts, sec. 152, p. 89; Twitty v. McGuire, 7 N.C. 501, 504.

In Twitty v. McGuire, 7 N.C. 501 (1819), one party undertook to build a house for another and actually did build it in the dimensions and form prescribed in the agreement, but some of the materials used were inferior and the work was not done in a workmanlike manner. It was better, stated the Court, that the house built under such circumstances should be considered a part performance of the builder's covenant, and that the measure of the damages was the difference between the value of the house if properly constructed and the value as actually built.

The cases measuring damages by the cost of making the building conform to the contract are generally limited to circumstances " 'where the defects or omissions are of such a character as to be capable of being remedied.' " Durham Lumber Co. v. Wrenn-Wilson Construction Co., 249 N.C. 680, 107 S.E.2d 538, 540 (1959). See also: T. C. Allen Construction Co. v. Stratford Corporation, 384 F.2d 653 (4th Cir. 1967).

The diminution of value theory has been applied in other jurisdictions in cases where the non-conformity was relatively minor and the expense of making the building conform would be great. Plante v. Jacobs, 10 Wis.2d 567, 103 N.W.2d 296 (1960) (a wall between the living room and kitchen of a home was misplaced); Kendrick v. White, 75 Ga. App. 307, 43 S.E.2d 285 (1947) (lower grade materials used and work done in unworkmanlike manner); Olsen v. Hen-

derson, 113 App.Div. 676, 99 N.Y.S. 917 (1906) (a house was built on a parallel line one foot away from the line specified in the plans).

It appears clear that the diminution of value rule applies to a construction contract where the cost of tearing off the roof would be prohibitive, whereas the actual loss of value to the owner due to the appearance of the roof is at most minimal. Fry Roofing expressly undertook to supply the plaintiff with roofing of a uniform color. The apartment project is complete and is occupied with tenants. The only defect in the roof is its appearance, the color not being uniform. The North Carolina case law indicates that even where the defects are of a more serious nature, involving inferior materials and poor workmanship, the measure of damages will not be the cost of making the building conform to the contract where the cost of tearing down what has already been done would constitute an obvious waste. Under these circumstances, the damages recoverable by the plaintiff are to be measured by the difference in the value of the apartment project as it presently stands and its value had the color of the roof been uniform.

■ 3. While there has been no express evidence dealing with actual diminution in value, the Court recognizes that such would be hard to establish in such an extensive apartment project as this. However, sitting as a jury, the Court viewed the premises and agrees that there is a question of aesthetics involved and the roof might conceivably cause some minor concern to prospective buyers in a future sale.

Under the circumstances, the Court is of the opinion that the plaintiff is entitled to an award of $7,500.00.

4. Attorney for the plaintiff is directed to prepare a judgment order in accord with this Memorandum Opinion, specifically referring thereto, and preserving the exceptions of all parties, plaintiff and defendants.

## SUPPLEMENTAL OPINION

A formal Memorandum Opinion treating the problem of liability and damages between the plaintiff, Salem Towne Apartments, Inc., and the defendants, McDaniel & Sons Roofing Company, Lloyd A. Fry Roofing Company, and third-party defendant, Southeastern Roofing Distributors, was filed herein on March 11, 1970.

In essence, it was determined that Salem Towne was entitled to recover $7,500.00 from Fry, but that McDaniel was not liable to Salem Towne. In addition, Southeastern, third-party defendant, was found to be without fault on the major item in suit, but both Fry and Southeastern were retained as defendants for the one narrow issue remaining to be decided.

That issue, here before this Court, is whether McDaniel is entitled to recover from Fry and Southeastern, severally or jointly, the attorney's fees and costs incurred by McDaniel in its defense of this law suit.

Judge J. Braxton Craven, then Chief Judge of the Western District of North Carolina, in Metropolitan Life Insurance Co. v. Jordan, 221 F.Supp. 842, W.D.N.C. (1963), at page 843, said:

" * * * [I]n a diversity case a federal court should follow the state practice in respect to the allowance of attorney's fees."

■ To be quite candid, it originally appeared to this Court that, on a purely equitable basis, McDaniel might be entitled to reimbursement for a part of its counsel fees. On examination of the North Carolina law, however, this Court comes to a different conclusion.

In this case, Fry and Southeastern asserted affirmative claims against McDaniel, alleging negligent mishandling of the delivered roofing shingles. Evidence of the method of stacking the shingles when received on the construction site was heard by the Court as trier of fact, which found against Fry and Southeastern on this point. On this

issue the parties were akin to a simple plaintiff-defendant situation in an ordinary negligence action with McDaniel as plaintiff and Fry and Southeastern as defendants.

In such cases, absent a statute, ordinance, or contract language specifically imposing liability for attorney's fees, North Carolina does not allow a recovery for such fees.

In Perkins v. American Mutual Fire Insurance Company, 4 N.C.App. 466, 167 S.E.2d 93 (1969), the North Carolina Court of Appeals quoted with approval the following excerpt from 20 Am.Jur.2d, *Costs*, § 72, p. 58:

"The right to recover attorneys' fees from one's opponent in litigation as a part of the costs thereof does not exist at common law. Such an item of expense is not allowable in the absence of a statute or rule of court or in the absence of some agreement expressly authorizing the taxing of attorneys' fees in addition to the ordinary statutory costs."

Even in a case in which recovery was sought on the basis of a contractual provision for indemnity for attorney's fees, the North Carolina Court of Appeals denied liability because the language was "not sufficiently comprehensive." Queen City Coach Company v. Lumberton Coach Company, 229 N.C. 534, 50 S.E. 2d 288 (1948). In that case, the Court had the opportunity to award the attorney's fees on an equitable basis, even though the contract might not have been sufficiently broad, but it refused to do so, saying at page 289:

"In the absence of an express agreement therefore this [loss and damage] would not include amounts paid for attorneys' fees."

The claim for attorney's fees asserted by McDaniel & Sons Roofing Company will be denied.

█ Fry raises the post-trial issue that the two letters of guaranty for the roofing material made by Fry to Salem Towne, through McDaniel, should not have been considered as lacking in consideration.

This Court is of the opinion that there was bountiful consideration in this particular case and Fry Roofing Company's motion to reconsider is denied.

Counsel for McDaniel & Sons Roofing Company will prepare and present a proper judgment order in accord with this Memorandum and that previously filed on March 11, 1970, making specific reference to both Memoranda.