379 A.2d 344

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY *vs.*
BETHLEHEM STEEL CORPORATION *et al. vs.*
WALTER S. DOUGLAS *et al., d.b.a.* PARSONS,
BRINCKERHOFF, QUADE & DOUGLAS.

AUGUST 11, 1977.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris. JJ.

142

KELLEHER, J.   Anyone who has been to Newport in the last several years knows that the once slow but scenic ferry which crossed from Jamestown to Newport has long since given way to the marvels of modern engineering. A graceful suspension bridge now spans the east passage of Narragansett Bay and links Jamestown to Newport. Unfortunately, even before the structure was completed, its paint began to flake and it was ultimately determined that within a short period of time virtually the entire bridge would have to be repainted. The one point on which all of the litigants and their respective experts agreed was that the Newport Bridge had suffered the most catastrophic paint failure known to any of them — no small claim to fame.

On December 17, 1970, the Rhode Island Turnpike and Bridge Authority (the Authority) filed suit against Bethlehem Steel Corporation (Bethlehem or the company),[1] alleging that on April 25, 1966, Bethlehem had entered into a contract with the Authority (the contract) and that Bethlehem had breached the contract. Under the contract Bethlehem agreed to fabricate and erect the bridge's superstructure. Among other things, Bethlehem was also bound to furnish all steel for the project and was responsible for the surface preparation and application of paint to all ferrous metals and galvanized surfaces in accordance with the contract specifications. The Authority's basic contention was that Bethlehem had "failed adequately to prepare the surfaces required to be painted * * * failed properly to prepare and apply the paint in accordance with [the] specifications * * * [and] failed to do necessary remedial work." Originally, the Authority claimed damages of $2 million, but following completion of certain remedial work by a third party (Cannon), the Authority amended its complaint and sought damages of $6 million.

Bethlehem denied all liability and additionally filed a counterclaim. Count I alleged that the Authority still owed Bethlehem $811,661.27 plus interest for work performed under the contract.[2] The second count charged that the Authority had contracted with an engineering firm, Parsons, Brinckerhoff, Quade & Douglas (Parsons or the Engineer), for engineering advice and services including the "preparation and design of an adequate and suitable paint system" for the bridge (Section 7 Specifications or paint system); that Parsons had prepared the paint specifications; and that the paint system was "developed and prepared in a negligent manner." Damages of $2.5 million, plus interest and costs, allegedly due from the Authority and Parsons

---

[1]Throughout we shall refer only to Bethlehem, although its insurer, The Insurance Company of North America, was also named as a defendant.

[2]No error is claimed on appeal regarding this count.

were claimed. The third count alleged that due to the late delivery of certain tower and anchorage piers as well as to certain acceleration programs undertaken as a result of the delay, Bethlehem was prevented from performing its work in the manner and within the time planned. Therefore, the company claimed it had suffered a $4.5 million loss.

The trial justice, finding for the Authority and rejecting Counts II and III of the counterclaim, ultimately awarded the Authority $4,571,329.39. Bethlehem has appealed, claiming errors relating to a discovery ruling, the trial justice's findings and conclusions in favor of the Authority and against the company, and the award of damages. We shall first address the discovery question; then we will turn to the Authority's complaint and Count II of the counterclaim (The Paint Controversy). Count III (The Delay Controversy) will be discussed separately as will the damages question.

## I. *The Discovery Question*

Bethlehem alleges that the trial justice erred in refusing to allow the corporation to inspect certain diaries written by Parsons' Chief Field Engineer during 1971, 1972, and 1973, when he was largely responsible for overseeing remedial work, cleaning and repainting the steel, being performed by Cannon. Bethlehem had initially requested the diaries when the Chief Field Engineer was deposed and renewed the request at trial. Upon reading them, the trial justice ruled that under Super. R. Civ. P. 26(b)(2) they were not discoverable because they were "a writing prepared by the agent of a party in anticipation of litigation and in preparation for trial."

On appeal Bethlehem claims that this ruling is wrong because the volumes are discoverable in whole or in part as business records, and any portions of them covered by the work-product rule should simply have been excised. However, to qualify as a business record the writing must be kept in the ordinary course of business. *See Webbier* v.

*Thoroughbred Racing Protect. Bureau, Inc.*, 105 R.I. 605, 254 A.2d 285 (1969); *Douglas Furniture Corp.* v. *Ehrlich,* 91 R.I. 7, 160 A.2d 362 (1960); *Ostroff* v. *Stephen Girard, Inc.*, 79 R.I. 158, 85 A.2d 174 (1951). These diaries were a part of the Chief Field Engineer's *personal* records; he maintained diaries on all sorts of subjects including non-work-related readings and writings, family, physical exercise, and work responsibilities. These records were not part of Parsons' records; nor were they maintained at Parsons' direction. Accordingly, they were not discoverable as business records. We, therefore, find no fault with the trial justice's ruling.

## II.   *The Paint Controversy*

### A.   *Misconceived issues of law and fact*

At trial the Authority contended that the failure of the paint to adhere to the steel was caused by contaminants on the steel prior to painting. The alleged contaminant was "mill scale" or a residuum thereof. Mill scale is similar to rust in that both are caused by oxidation of the steel, but unlike rust in that it is bluish-black in color. However, whereas rust occurs at normal everyday temperatures, mill scale occurs in the manufacturing process as the steel cools, when temperatures are greater than $1000°$ F. Mill scale is not, therefore, an unusual condition. The prime component of mill scale is the oxide $FeO$, but $FeO$ is not always evident because it is an extremely unstable compound, which rapidly deteriorates. If chemical analysis reveals $FeO$, mill scale is present, but the absence of $FeO$ does not preclude the presence of mill scale.

Paint systems most commonly used on bridges contain a linseed oil and red-lead base which is capable of penetrating mill scale, thereby helping the paint to adhere to the steel. Such systems generally have a high pigment volume concentration (PVC) which also helps the paint adhere to the surface. The Newport system was epoxy rather than linseed oil based and had a low PVC. Witnesses at trial agreed that an

epoxy system had never been used on a bridge before; however, there was testimony that such systems had been used on ships and other marine structures and were in fact used on bridges subsequent to the painting of the Newport structure.

It was recognized that the epoxy system was not able to penetrate mill scale. Therefore, the steel used in the project would have to be free of mill scale, although the residual stain could remain. This required cleaning of the steel to standard specifications (SSPC) 6 level,[3] and this requirement was part of the Specifications under which Bethlehem was to perform. Essentially, the Authority claimed that the SSPC 6 level had not been met, whereas Bethlehem argued that no competent engineer would have ordered a new and untested paint system for this bridge.

Bethlehem's first argument, that the trial justice misconceived issues of law and fact, is two-pronged: (1) the trial justice's ultimate finding as to the presence of mill scale or residuum thereof was based on a purely conjectural preliminary finding, and (2) the trial court overlooked the distinctions between the claim and counterclaim and the burden of proof allocable to each of the parties.

In arguing that the findings as to mill scale were speculative, the company points to evidence adduced militating against its presence. Additionally, Bethlehem directs our attention to language in the trial court's decision which noted that the oxide FeO "might well disappear in the open air after a period of time." This further breakdown of the oxide would presumably account for its absence from the bridge's superstructure. Bethlehem strenuously maintains that FeO does not disappear into thin air as rapidly as the trial court suggests, but that even assuming the absence of FeO could logically be explained, a finding of "might

---

[3]Incorporated and made part of the contract was the *State of Rhode Island Standard Specifications for Road and Bridge Construction, 1965 Revision,* commonly referred to as the "blue-book."

well disappear" is insufficient to sustain the Authority's burden of proof. Had the trial justice based his conclusions solely on the instability of FeO, Bethlehem might have cause for complaint, but that simply is not the case. The question of whether the steel had been properly prepared was exhaustively litigated,

Numerous witnesses testified for and against the theory that mill scale or another contaminant was responsible for the paint failure. Quite simply, the question had to be resolved by weighing conflicting testimony. The trial justice did precisely this, and there was ample evidence on which he could base a finding concerning the presence of the mill scale. There was testimony that the paint system used on the Newport Bridge required an extremely careful job of surface preparation for the paint to adhere properly and that Bethlehem had encountered considerable difficulty with the blasting equipment it used to clean the steel. Witnesses also testified that examination of paint chip specimens from the bridge revealed the bluish-black substance on the underside of the chips was the oxide $Fe_3O_4$, which is usually the end product of corrosion. Moreover, the black substance conformed precisely to the contour of the paint, leading one to conclude that contaminants were on the steel when the paint was applied. There was expert testimony which identified the substance as mill scale. Finally the trial justice gave great weight to motion pictures taken in 1974, which showed that the remedial work performed by Cannon was holding up extremely well where Bethlehem's had failed.

As noted earlier, we will not disturb a trial court's finding unless it is shown to be clearly wrong. In light of the foregoing evidence, we cannot say that the trial justice was engaging in speculation, and accordingly we will not disturb his finding that mill scale or other contaminants were on the steel before Bethlehem began to apply the paint.

The second aspect of Bethlehem's argument on this point concerns each party's burden of proof. Essentially, the com-

pany contends that the trial justice rolled into one the Authority's claim and Count II of Bethlehem's counter-claim, found that Bethlehem did not prove Count II, and concluded that, therefore, the Authority's claim was prov-en. This formulation of the trial justice's findings and con-clusions misses the mark. While it is true the trial court spoke in terms of the "sole controversy" being whether the paint failure was due to faulty steel preparation and paint application or attributable to inherent deficiencies of the paint specifications themselves, it does not necessarily follow that he misperceived the respective burdens of proof. Indeed, quite the opposite is evident in his decision. After summarizing the evidence at length and making numerous findings of fact, the trial justice observed that "[a]lthough the plaintiff AUTHORITY has the burden of proving by a fair preponderance of evidence that the paint failure was due to a faulty preparation of the steel by BETHLEHEM in that mill scale and other contaminants were not removed to an SSPC No. 6 level prior to the application of paint, it is not necessary that the plaintiff prove beyond a reasonable doubt that the contaminant in each instance was mill scale." The court then found that the Authority had met its burden, that contaminants were present at the time of painting, and that in most instances the contaminant was mill scale or a residuum thereof. Proceeding to Bethlehem's burden of proof on Count II, the trial justice observed that the company's attempt to show that the Section 7 Specifica-tions were inherently inadequate was a "complete failure." He found the "overwhelming weight of the testimony" showed "almost beyond doubt" that the paint system designed by the Engineer was adequate for the Newport Bridge. He thus concluded that "the massive failure which took place by 1970 was due to faulty surface preparation and/or application on the part of BETHLEHEM, its employees and agents."

We are sure that the trial justice would be the first to ad-mit that he treated the "paint controversy" as an entity. He

summarized separately the evidence pertaining to it and made separate findings of facts and conclusions of law. We find no fault, however, with his treatment of the issue. The claim and counterclaim were not tried separately; all parties presented evidence on the steel preparation as well as the paint specifications. To argue, as Bethlehem has, that the trial justice erred because he spoke in terms of the "sole controversy" is to pay homage to semantics. It is abundantly clear from the findings and conclusions recited above that the trial justice knew the task before him and performed it. We, therefore, reject the contention that the trial justice misconceived issues of law and fact applicable to the Authority's complaint.

## B.   *Estoppel*

Bethlehem next argues that even if it did fail to prepare or paint the steel properly, the Authority should be estopped from claiming such. In support of this contention, the company maintains that agents of the Authority inspected and approved the work, and any alleged defects would have been discoverable. Moreover, says Bethlehem, certain contractual provisions preclude the Authority from recovering damages following inspections and approval of the steel.

The Authority engaged inspectors from Pittsburgh Testing Laboratory (PTL) to inspect Bethlehem's cleaning, preparation, and painting of the steel at Bethlehem's Pottstown, Pennsylvania plant. A total of eight inspectors worked at the plant for approximately 2 years. Four men on the day shift, and two on the evening and night shifts, kept an eye on all operations concerning the Newport project. Their duty was to "spot check the cleaning and painting operations on more than one shift at unannounced times." The chief inspector of the Newport job estimated that approximately 10% of the steel was actually checked in various stages of cleaning and painting. The total amount of steel produced by Bethlehem for the Newport project was estimated to be 10,000 to 10,200 pieces. Thus, approximate-

ly 1,000-1,200 pieces were spot checked. Of these, about 842, 70-84%, were found unsatisfactory by the PTL inspectors.

Bethlehem inspectors were also on the job. The company had designed a system for keeping track of when its own or PTL employees checked material. Each steel member was marked with a yellow tag, which Bethlehem said signified the steel was ready for painting. The tags had places for inspectors to mark which coat of paint they had approved. There was no specific place for noting that cleaned but unpainted steel had been checked and approved. PTL's chief inspector testified that his men did not check all steel prior to Bethlehem's yellow-tagging, and PTL workers themselves never yellow-tagged anything. There was, however, another tagging procedure — the red tag. It signified that PTL had visually inspected the finished product, found it suitable, and was releasing it for shipment. Later, in the fall of 1969 the Engineer inspected and approved a large segment of the bridge and thereafter released a portion of the contract retainage applicable to the completed areas.

Based on this inspection and approval, Bethlehem maintains that because the defects were discoverable, the Authority is precluded from recovering remedial costs after the steel was incorporated into the structure. An examination of the cases cited by Bethlehem as well as numerous others fails to persuade us to this point of view. In those cases where the owner was estopped from asserting breach, one or more of several circumstances was present: (1) *each* piece of material was subject to careful examination; (2) the owner, in effect, was challenging the very specifications which he had mandated and which the work product had met; (3) the inspecting party did not object or complain about any of the work. Had PTL inspected each piece of steel prior to painting and never complained about the workmanship, we might well be faced with a situation where the owner had lulled the contractor into a false sense

of assurance. But in this case quite the opposite is evident. All parties involved knew that PTL was only spot checking. Furthermore, the inspectors hardly closed their eyes to discrepancies, demanding that at least 70% of the work inspected receive remedial treatment. Bethlehem cannot now be heard to claim it was led down the proverbial primrose path.

Nor can the Engineer's partial acceptance of the work bar the Authority's claim, for the contract specifically provides that:

> "Any approval by the engineer of any materials, workmanship, plant, equipment, drawings, programs, methods or procedure, or of any other act or thing done or furnished, in or in connection with the performance of the work, *shall be construed merely to mean that at the time the Engineer knows of no good reason for objecting thereto; and no such approval shall release the Contractor from his full responsibility for the accurate and complete performance of the work in accordance with the Plans and Specifications* or from any duty, obligation or liability imposed upon him by the provisions of the contract." (Emphasis added.)

It is evident from this provision that defects of which the Engineer was not cognizant can be the subject of a complaint subsequent to the Engineer's approval. Bethlehem does not contend, nor do we think that the Engineer was under a duty to test the steel once it was incorporated into the bridge. The Engineer had a right to believe Bethlehem had fulfilled its side of the contract. Bethlehem seems to rely on the notion that the defects were discoverable, but we have not been shown any testimony which would establish that a visual inspection of the bridge would reveal the presence of mill scale under three coats of paint.

Bethlehem, however, makes yet two more arguments. The first is that the special contract provisions relating to

paint and painting envisioned the possibility of dispute and provided for arbitration.[4] Thus, says the company, it is unfair to allow claims for deficient work long after the event when such work failures could have been remedied at an earlier time. The only problem with their theory is that no dispute within the meaning of the section ever arose. The chief inspector noted that whenever PTL requested remedial work, it was done.

Finally, Bethlehem points to sec. 106.04 of the Standard Specifications relating to "Plant Inspection." This section provides that despite any plant inspection and acceptance, the Authority may retest the material at the site and, prior to the material's incorporation into the structure, reject defective work. Bethlehem maintains that under this provision, the Authority cannot reject the company's product once it is built into the bridge. We are constrained to disagree with Bethlehem on this point. Standard Specification 105.16(b), relating to final acceptance, reads in pertinent part:

> "Upon due notice from the Contractor of presumptive completion of the entire project, the Engineer will make an inspection * * * .
>
> "If, however, the inspection discloses any work, in whole or in part, as being unsatisfactory, the Engineer will give the Contractor the necessary instructions for correction of same, and the Contractor shall immediately comply with and execute such instructions."

Reading this section in conjunction with sec. 106.04, cited by Bethlehem, we conclude that the "Plant Inspection" provision provides merely that plant approval is not final. Fur-

---

[4]This section provides in part: "All work under this specification shall be subject to inspection by the owner or his representative. All parts of the work shall be accessible to the inspector. The contractor shall correct such work as is found defective under the specifications. If the contractor does not agree with the inspector, the arbitration or settlement procedure established in the contract, if any, shall be followed. If no arbitration or settlement procedure is established, the procedure specified by the American Arbitration Association shall be used."

thermore, sec. 106.04 does not mandate the Authority to test every piece of steel before it collectively becomes a bridge, or the Authority forever hold its peace. The final acceptance provision clearly envisions the possibility of remedial work "in the air."

Accordingly, we reject Bethlehem's argument that the Authority is estopped from asserting its claim.

## C. *Counterclaim*

Bethlehem also contends that the trial justice erred in dismissing Count II of the counterclaim wherein the company alleged that the paint system "was developed and prepared in a negligent manner and not in accordance with the usual and customary standards of care and professional competence." On appeal Bethlehem argues that the Engineer was negligent as a matter of law. It is well established that negligence is ordinarily a question of fact, *Ferreira* v. *McGrath Truck Leasing Corp.*, 104 R.I. 642, 247 A.2d 842 (1968), and it is only when the evidence presented and reasonable inferences therefrom are susceptible of only one conclusion that it becomes a matter of law. *See Garris* v. *Gloss*, 111 R.I. 453, 303 A.2d 765 (1973); *Waltz* v. *Aycrigg*, 103 R.I. 109, 235 A.2d 338 (1067).

Bethlehem contends that the trial justice did not find the Engineer *not* negligent, but "simply found that the paint specifications were adequate." In fact, the court in dismissing this count of the counterclaim found the specifications "adequate and suitable for the purpose for which they were intended." We fail to see how a company that designed a paint system which the trial justice specifically found to be "adequate and suitable" for its purposes could be negligent as a matter of law, but in any event we find the trial justice's conclusions amply supported by the evidence.

There was abundant testimony tending to show that the paint system was properly designed. Even the so-called "father of epoxy coatings," noting the marine environment,

stated unequivocally that the paint system was not just adequate but "excellent for * * * the bridge." Evidently the trial justice found the experts on behalf of the Authority and Parsons more persuasive, for he commented that on the whole they were more experienced and qualified than Bethlehem's principal witnesses, with the possible exception of one particular Bethlehem employee who was the coatings expert of that company's own research laboratory. This employee, however, had in fact approved the paint specifications. As the trial justice observed, "[h]ad the specifications been so inherently and obviously defective" as is now asserted, this employee would have been qualified and "in a position to point this out very quickly."

In our opinion, even a cursory examination of the foregoing evidence reveals that the trial justice could well find the specifications "adequate and suitable" and not negligent as a matter of law or fact. Therefore, we affirm his rejection of Count II of the counterclaim.

### III. *The Delay Controversy*

We come now to the "Delay Case" and Bethlehem's contention that the trial justice erroneously dismissed the third count of the counterclaim. This particular claim resulted from the fact that another contractor (Perini) was tardy in furnishing six tower and anchorage piers on which Bethlehem was to construct the superstructure. Bethlehem argues that the Authority had promised that the piers would be completed within a certain time. Bethlehem's complaint and answers to interrogatories indicated that the company's alleged injury revolved around these six key piers; however, during trial the company was allowed to introduce evidence of damages flowing from belated delivery of all the piers. Bethlehem's complaint also charged that the Authority demanded that Bethlehem accelerate its work schedule to compensate for time lost on account of Perini as well as other contractors and, subsequently, when the acceleration program was frustrated by circumstances beyond Bethle-

hem's control, the Authority abandoned the program. According to the company, these "acts and omissions * * * unreasonably delayed and actively interfered with the performance of Bethlehem's work and prevented Bethlehem's timely and economical performance of the Contract."

The initial contract with Perini, concerning the six basic piers, was signed prior to the Authority's contracting with Bethlehem for the latter's construction of the superstructure. That contract with Bethlehem provided in part: "Tower piers 1W and 1E are scheduled for completion about October 30, 1966 and piers 2W, 2E, Anchorage Piers 4W and 4E are scheduled for completion about January 30, 1967." Contracts for the other piers and concrete work were awarded to Perini, Gammino Construction Company (Gammino) and Coleman Brothers Corporation (Coleman) between September 1966 and March 1967, after Bethlehem had been retained.

[10]   First we will deal with Bethlehem's argument that the contract provision quoted above constituted an implied promise to furnish the piers on approximately the dates specified. This would mean that the Authority would be warranting the timeliness of work outside its control. However, it is hardly "within the realm of normal expectation" that the Authority would "voluntarily stand as a guarantor of the performance of its contract by another contractor within a specified time. *Gilbane Building Co.* v. *United States*, 333 F.2d 867, 869 (Ct. Cl. 1964), *citing H.E. Crook Co.* v. *United States*, 270 U.S. 4, 46 S. Ct. 184, 70 L. Ed. 438 (1926). It has also been said that the government will not be held liable unless the contract can be interpreted as implying an unqualified warranty to make the work in question available. *United States* v. *Foley*, 329 U.S. 64, 67 S. Ct. 154, 91 L. Ed. 44 (1946).

In *Gilbane* the disputed language provided that work under another contract "will be completed and the site available to commence work specified under this contract on November 22, 1954." *Gilbane Building Co.* v. *United*

*States, supra* at 869. The court in that case found that those were not words of warranty. The contract provision on which Bethlehem relies is, if anything, less compelling than that in *Gilbane*. In light of the foregoing authorities, we cannot accept the premise that the Authority gave an unqualified promise to Bethlehem that Perini's work on the first six piers would be available on certain dates. The Authority may have represented that the work would be done at a specified time, but there was no guarantee. *Gilbane Building Co.* v. *United States, supra.* Thus, we find no fault with the trial justice, who concluded that the schedules set forth in the bid documents were by way of information and did not purport to constitute a promise, guarantee or warranty.

Secondly, we conclude that a provision of the contract specifically precludes Bethlehem from holding the Authority accountable for any delays caused by other contractors, including here Perini, Gammino, and Coleman. This provision is not limited to the first six Perini piers, but covers also damages relating to late delivery of all the piers.

Paragraph 105.07 of the Standard Specifications reads in pertinent part:

> "When separate contracts are let within the limits of any one project, each contractor shall conduct his work so as not to interfere with or hinder the progress or completion of the work being performed by other contractors. Contractors working on the same project shall cooperate with each other as directed.

> "Each contractor involved shall assume all liability, financial or otherwise, in connection with his contract and shall protect and save harmless the Department from any and all damages or claims that may arise because of inconvenience, delay, or loss experienced by him because of the presence and operations of other contractors working within the limits of the same project."

Arguing that this provision is inapplicable, Bethlehem maintains: (1) the word "project" in the second quoted paragraph means Bethlehem's contract and does not, therefore, pertain to delays resulting from other contracts, specifically those with Perini, Gilbane, and Coleman; (2) paragraph 105.07 is a "protect and save harmless" clause, which in this case the company claims is only an indemnification provision,[5] rather than a "no damages for delay" clause; and (3) even if this is a "no damages" clause, it should not apply here because the delays were unreasonable.

We note first that Bethlehem's interpretation of "project" does not withstand scrutiny. Reading the two quoted paragraphs together, one can see that paragraph 105.07 envisions the awarding of more than one contract within a given project, which in this case was the construction of the Newport Bridge.

Secondly, the company's "protect and save harmless" argument does not hold water. A close reading of the language in question makes it apparent that the provision exculpates the Authority:

> "Each contractor involved [Bethlehem] * * * shall protect and save harmless the Department [Authority] from any and all damages or claims that may arise because of inconvenience, delay, or loss, experienced by him [Bethlehem] because of the presence and operations of other contractors [Perini et al.] working within the limits of the same project."

The interpretation Bethlehem urges, i.e. a classic indemnification clause, would mean that Bethlehem would in-

---

[5]Bethlehem also contends the section is inapplicable because the company is not complaining of delay caused by other contractors, but rather is basing its claim on the "fact" that the Authority made certain representations on which it intended the company to rely. We do not deal with this argument because Bethlehem *does* base its argument on the delay of other parties and we have already ruled that the Authority did not make any guarantee vis-a-vis the piers.

demnify the Authority in case of any claims by Perini et al. That simply is not a sensible reading of this section.

The company's third contention on this point is also without merit. Even assuming, *arguendo*, that "delay" is to be construed as meaning "reasonable delay," we cannot say as a matter of law that based on all the evidence presented below this delay was unreasonable. The original construction schedule presented by Bethlehem projected completion of the bridge around April 30, 1968. Under the various acceleration programs adopted by Bethlehem and the Authority, the bridge was to be ready on August 2, 1968. Further delay was due to circumstances outside the control of the Authority, Bethlehem or any of the other contractors: certain iron workers on the deck contract went on strike. Thus, barring the strike, the delay in completion of the bridge would have been only 3 months. Furthermore, Bethlehem has presented us with no evidence suggesting that it was precluded from beginning work, or sat idle for significant periods of time during the construction period. Thus, we conclude that paragraph 105.07 prevents Bethlehem from recouping from the Authority any losses due to delay in pier delivery.

Another of Bethlehem's contentions was based not upon delayed delivery of the major piers, but rather on costs incurred for work (bush hammering)[6] beyond the scope of the contract. The trial justice, finding that there was an ambiguity in the contract concerning the work, concluded that if Bethlehem considered this "extra work," then a timely claim for compensation should have been made under paragraph 105.17 of the Standard Specifications.[7] Since no claim

---

[6]"Bush hammering" refers to a technique whereby the concrete piers which support the bridge's superstructure are ground down to precise elevations.

[7]"If, in any case, the Contractor deems that additional compensation is due him for work or material not clearly covered in the contract or not ordered by the Engineer as extra work, as defined herein, the Contractor shall notify the Engineer in writing of his intention to make claim for such additional compensation before he begins the work on which he bases the claim. If such notification is not given,

was made until sometime during trial, the claim was waived. Bethlehem has not shown us that the trial justice misconceived or overlooked material evidence or was otherwise clearly wrong. The company recognizes that the bush hammering was "extra work," but has not even alleged compliance with paragraph 105.17. Therefore, we affirm the trial justice's ruling as to the bush hammering.

Finally, we come to that portion of Bethlehem's argument wherein they maintain that the delays discussed above plus the undertaking and subsequent abandonment of various acceleration programs constituted unreasonable delay and active interference.

Having previously addressed the delay questions, we will deal now only with the alleged "active interference." We note first that despite Bethlehem's claims to the contrary, the company was not *ordered* to accelerate its work. The record amply supports the finding that Bethlehem and the Authority agreed to the various acceleration programs after numerous meetings and exchanges of correspondence. Bethlehem has not shown us that the trial justice was clearly wrong in concluding that "the AUTHORITY and PARSONS did not actively interfere with the work of the project, but did everything within their power to promote, implement and accelerate such progress throughout the life of the entire project."

Based on the foregoing analysis, we conclude that the trial justice properly dismissed Count III of the counterclaim and, accordingly, we will not address other rulings made by the trial justice on this matter or Bethlehem's objections to them.

## IV. *Damages*

The final award of damages, as determined by the trial

---

and the Engineer is not afforded proper facilities by the Contractor for keeping strict account of actual cost as required, then the Contractor hereby agrees to waive any claim for such additional compensation."

justice, gave the Authority $4,571,329.39 plus costs.[8] This was determined as follows:

| | |
|---|---:|
| Phase I - Remedial Painting Costs | |
| incurred to date | $2,342, 370.63 |
| Engineering costs incurred | 232,037.00 |
| | $2,574,407.63 |
| Phases II, III, IV[9] - Estimated | |
| future remedial painting costs | 2,215,000.00 |
| Estimated engineering costs | 275,000.00 |
| | $5,064,407.63 |
| Credit to Bethlehem under Count I | |
| of the counterclaim | 804,996.55 |
| | $4,259,411.08 |
| Interest on sums for painting | |
| under Phase I | 283,569.47 |
| Interest on sums for engineering | |
| under Phase I | 28,348.84 |
| TOTAL | $4,571,329.39[10] |

The trial justice specifically found these costs reasonable in amount and reasonably necessary to restore the bridge to the condition it would have been in had Bethlehem fulfilled its contractual obligations.

Bethlehem contends initially that an award of over $4.5 million is grossly disproportionate to the approximately $19 million the company received for all its work under the contract. Relying on the doctrine of economic waste and related theories, Bethlehem suggests that where the cost of repair is great, or the remedial effort involves unreasonable ex-

---

[8]Parsons was also awarded costs under Count II of the counterclaim, but that award is not contested.

[9]The remedial work was broken into four phases, the first of which had been completed at the time of trial. Phases II-IV are referred to as future remedial costs.

[10]The trial justice awarded interest on amounts due over and above the credit to Bethlehem, at the rate of 6% from the time various payments were made until December 31, 1975.

pense, the proper measure of damages is the difference in value between what the bridge was worth as completed and what it would have been worth if completed in accordance with the specifications.

We are not convinced that this is a case of economic waste. Justice Cardozo, in perhaps the classic of such cases, observed that difference in value is the measure of damages where the cost of completion is grossly and unfairly out of proportion to what will be attained. *Jacob & Young v. Kent*, 230 N.Y. 239, 129 N.E. 889 (1921). In that case, Kent had contracted for a house with Reading pipe installed therein, but the builders instead used Cohoes pipe, which was substantially the same. To remedy the situation would have been to tear down the inner walls of the house, replace the plumbing, and rebuild the structure. The case before us is hardly one of Reading pipe. *See also Salem Towne Apts., Inc. v. McDaniel & Sons Roofing Co.*, 330 F. Supp. 906 (E.D.N.C. 1970).

Nor can we say that simply because the damages are approximately 25% of Bethlehem's contract fee they are necessarily disproportionate. *See Johnson v. Flammia*, 169 Conn. 491, 363 A.2d 1048 (1975). While the cost of repair is great, we cannot find as a matter of law that it is unreasonable. Without a doubt, Cannon's remedial work differed in one very material aspect from the task Bethlehem confronted. Whereas Bethlehem performed its job in the plant and on the ground, working on individual steel members, Cannon's work was in the air, and all parties would agree the remedial work was infinitely more difficult.[11] Indeed, that was part of the thrust of Bethlehem's argument, i.e., it would have been far easier (and less expensive) to correct any defects in the shop, prior to construction.

---

[11]The remedial work was most definitely "in the air"; the center span is 215′8″ above water, and the two main towers holding the suspension cables reach 400′ above the bay. See Appendix, p. 170.

Finally, Bethlehem has not pointed to any testimony which would show that the difference in value estimate would be any different from what the trial justice awarded. For us to hazard a guess on the value of the Newport Bridge with a flaking paint job would be unconscionable speculation. Thus, we find no error with the trial justice's method of awarding damages.

Secondly, Bethlehem contends that insofar as Phase I is concerned, Cannon expended material and effort in excess of what the contract required and that remedial costs were, therefore, excessive. In support of this contention, the company points to purportedly undisputed testimony that Cannon cleaned the steel to a greater degree and applied more paint than was required. On the contrary, our review of the record shows that the testimony was conflicting. Furthermore, in our opinion, such costs are unreasonable only when material and labor are expended "beyond what in reason and good workmanship was contemplated by the original contract." *Plymouth Village Fire District* v. *New Amsterdam Cas. Co.*, 130 F. Supp. 798, 802 (D.N.H. 1955). Certainly, what was contemplated by the contract in this case was a serviceable paint job. In light of all the circumstances involved, we do not think that the trial justice was clearly wrong in finding the remedial costs reasonable.

Bethlehem also maintains that the $232,037 awarded for engineering costs related to Phase I is without basis in the record. We must agree. Although the record reveals confusion on the matter, our reading of it indicates that the figure of $232,037 was Parson's in-house estimate; only $212,872 was actually billed and paid. In light of the fact that the damages issue will be remanded on other grounds, we will not make any adjustment to the award. The trial justice, in reconsidering various other facets of the award, shall take this error into consideration.

Bethlehem's fourth argument is that the Authority was under a duty to mitigate damages by using a "conventional

red lead system" for the repairs rather than the more expensive epoxy system required under the contract. We find no merit to this argument and see no reason why the Authority should have to settle for something less than it bargained for, the epoxy system being designed to withstand better the rigors of Narragansett Bay's climate. It is well established that the rule concerning damages is designed to place the injured party in *as good a position as he would have been* in had the contract been fully performed as promised. 5 Corbin *Contracts* §992 (1964).

Next Bethlehem argues that damages should have been based on costs at the time of breach, 1966-1968 when the work was originally done at the Pottstown plant, rather than based on 1971-1973 prices when remedial work was done and on estimated future costs. Along those lines we recently held that where there was injury to real property, damages should be assessed as of the time of injury rather than the time of judgment. *Tortolano* v. *DiFilippo*, 115 R.I. 496, 349 A.2d 48 (1975).

The basic problem we have with Bethlehem's argument is the premise that the breach occurred in 1966-68 at the time of cleaning and painting the steel. While the question of time of the breach was not considered by the trial justice, we have no trouble upholding his award in this regard. The breach as it affects remedial work could not possibly have occurred until Bethlehem left the job in the fall of 1970, refusing to do any further work, in violation of its remedial duty under the contract. At that time the Authority began its search for another contractor who performed the remedial work in the ensuing painting seasons. Accordingly, the 1971-1973 and estimated costs were not "inflated costs" due to unreasonable delay in making repairs. *See Gaylord Builders* v. *Richmond Metal Mfg. Co.*, 186 Pa. Super. 101, 140 A.2d 358 (1958).[12]

---

[12]In *Tortolano* v. *DiFilippo*, 115 R.I. 496, 349 A.2d 48 (1975), the plaintiff received an estimate for repairs to a retaining wall at the time of injury, but 2 years

Bethlehem, however, claims several other errors regarding damages awarded for future painting and engineering costs. The first of these is that no award should be made for future painting costs because Bethlehem did not guarantee the life of the paint. In our opinion, a guarantee is not necessary. The Authority contracted for a paint job estimated to last up to 15 years, but as a result of Bethlehem's breach, the work fell far short of that expectation. Therefore, some allowance for future costs is proper.

On the other hand, the Authority has received some benefit from Bethlehem's work; the paint has lasted a few years, the duration varying in different sections of the bridge. Accordingly, Bethlehem must receive some credit for the benefit bestowed, Cannon's costs should be prorated over the expected life of the remedial paint job, and Bethlehem should be charged only that portion allocable to the shortfall of its own work. *See 525 Main Street Corp.* v. *Eagle Roofing Co.*, 34 N.J. 251, 168 A.2d 33 (1961).[13] Because the trial justice did not make findings as to the expected life of Bethlehem's or Cannon's work under the Section 7 Specifications, we remand the case for futher findings and assessment of damages in accordance with this rule.

Bethlehem also claims that future painting costs were erroneously calculated because square footage figures on which estimates were based were taken out of thin air and certain contingency factors[14] which raised the costs were considered twice. Although mathematical exactitude is not required, the damages must be based on reasonable and

---

later at trial still had not made repairs. In *Gaylord Builders* v. *Richmond Metal Mfg. Co.*, 186 Pa. Super. 101, 140 A.2d 358 (1958), the court found the defendant had failed to mitigate by having the contract completed at the time of breach rather than waiting approximately 4 years.

[13]Thus, if Bethlehem's work should have lasted 10 years, but repainting was necessary after 2, Bethlehem can be charged only 80% of the remedial cost.

[14]These contingency factors included consideration of surfaces which would not be included in the square-foot calculations, as well as costs due to necessary rigging, scaffolding, etc.

probable estimates. *See Pescatore* v. *MacIntosh,* 113 R.I. 139, 319 A.2d 21 (1974); *Bertozzi* v. *McCarthy,* 164 Conn. 463, 323 A.2d 553 (1973). We have reviewed the testimony and exhibits pertaining to the square footage calculations and are at loss to determine their reasonableness. Therefore, we direct the trial justice on remand to clarify his finding that the estimates were reasonable by setting forth the evidence on which he based that finding. On the other hand, there was testimony from which the trial justice could conclude that the various contingency factors added to the calculations for Phases II, III, and IV were reasonable and not duplications. Thus, we find no error insofar as the estimates reflect consideration of those factors.

Nor do we find any error, as is claimed, in the $275,000 awarded for future engineering costs. Despite Bethlehem's protestations to the contrary, there is sufficient testimony in the record to warrant the trial justice's finding that this estimate is reasonable.

Bethlehem also claims, however, and the Authority agrees, that the trial justice in awarding damages under Phase IV included portions of the structure which the parties stipulated were not in dispute. Thus, on remand the trial justice shall determine the extent of the stipulation as well as the cost allocable thereto and reduce the award accordingly.

Bethlehem's final contention concerning damages for future remedial costs is that the award should be discounted in consideration of the fact that the Authority will have use of the money. We agree that the award must be reduced to present worth, allowing only that sum which, with the accumulation of interest, will amount to such damages as will in the future be sustained. *Gregorius* v. *Safeway Steel Scaffolds Co.,* 409 Pa. 578, 187 A.2d 646 (1963). *See also Petition of U.S. Steel Corp.,* 436 F.2d 1256 (6th Cir. 1970); *Brodie* v. *Philadelphia Transp. Co.,* 415 Pa. 296, 203 A.2d 657 (1964).

Bethlehem's last assertion of error is that although the trial justice awarded the Authority interest on money paid

to Cannon over and above the money due to Bethlehem under the counterclaim, the trial court did not award Bethlehem interest on the $804,996.55 from the date it was due, October 1970, until it was paid to Cannon. Bethlehem bases its argument that interest is due on the premise that the counterclaim was liquidated and independent of the Authority's claim. There is merit to this contention. *See W.K. Contracting Co.* v. *Ashland Oil Refining Co.*, 478 F.2d 1046 (6th Cir. 1973); *Eastmount Constr. Co.* v. *Transp. Mfg. & Equip. Co.*, 301 F.2d 34 (8th Cir. 1962); *Carpenter* v. *Mass. Bonding & Ins. Co.*, 161 Me. 1, 206 A.2d 225 (1965); *Pearson* v. *Ryan*, 42 R.I. 83, 105 A. 513 (1919). Although the cases reviewed involved situations where the party claiming interest was the net victor, we fail to see why the net outcome should alter the legal principles involved.

The Authority had use of the $800 thousand plus until it began to pay Cannon. As those payments proceeded, the Authority had use of less and less of the $804,996.55, until the time when the sum was exhausted. At that time, Bethlehem's credit ran out, and principal and interest began to accrue in favor of the Authority. Therefore, we direct the trial justice on remand to award Bethlehem interest on such sums as the Authority had use of until the Bethlehem credit was exhausted.

The defendant's appeal is affirmed in part and denied in part, and the case is remanded to the Superior Court for further consideration in accordance with this opinion.

*Hogan & Hogan, Edward T. Hogan, Howard A. Feldman, Sheffield & Harvey, Brian G. Bardof* (for Rhode Island Turnpike and Bridge Authority), for plaintiff.

*Edwards & Angell, John V. Kean, George W. Shuster, Hynes & Diamond, Leslie A. Hynes* (for Bethlehem Steel Corporation and Insurance Company of North America) *John F. Dolan* (for Parsons, Brinckerhoff, Quade and Douglas), for defendants.