**In re William F. KELLEY and Doreen M. Kelley, Debtors.**

**William F. KELLEY and Doreen M. Kelley, Plaintiffs,**

v.

**Floriano MEDEIROS, Defendant.**

**Bankruptcy No. 90–10463.**
**Adv. No. 90–1068.**

United States Bankruptcy Court, D. Rhode Island.

Aug. 28, 1991.

---

Thomas W. Kelly, Newport, R.I., for debtors, plaintiffs.

Thomas T. Brady, Tiverton, R.I., for defendant.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on February 8, 13, 14, and 27, 1991, on the amended complaint of the Chapter 13 Debtors to declare void the Defendant's security interest in their single family residence located in Tiverton, Rhode Island.

## PROCEDURAL HISTORY

On June 27, 1990, Plaintiffs filed their original complaint which sought in three counts: (1) rescission of their contract with the Defendant for the construction of their house; (2) damages for breach of said contract; and (3) damages resulting from the Defendant's negligent construction of the house. On August 3, 1990, the Plaintiffs amended Count III to eliminate the negligence claim, and substituted a count to determine the validity of the security interest granted to Defendant in connection with the purchase of the real estate.

On August 8, 1990, after hearing on Defendant's motion to dismiss the adversary proceeding, we granted Defendant's motion to dismiss Count II of the amended complaint, on the ground that an identical civil action was pending in the Rhode Island Superior Court (*William F. Kelley and Doreen M. Kelley v. Floriano Medeiros*, CA No. NC89–248).[1]

On October 3, 1990, the Defendant filed an amended answer and counterclaim, seeking the full balance due under the note plus attorney's fees and collection costs.

On February 26, 1991, at the close of Plaintiffs' case-in-chief, we granted Defendant's motion for involuntary dismissal under Bankruptcy Rule 7041(b), as to the claim for rescission.

At the conclusion of the five-day trial, we took a view of the subject property and requested briefs. As a result of the aforementioned pre and post-trial rulings, the only remaining issue is the Plaintiffs' claim for a determination of the amount and/or validity of the Defendant's security interest in the subject property.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(K).

---

1. The State court civil action is still pending.

## FACTS

On or about April 27, 1988, Plaintiffs and Defendant entered into a written agreement for the purchase of the Defendant's real estate at 2 Christina Drive, Tiverton, and for completion of the four bedroom contemporary house then under construction by the Defendant, for a total price of $280,000. Although no plans or specifications were specifically incorporated, the contract called for "plans and specifications for construction of said house to be the same as the house constructed on 15 Christina Drive, Tiverton, Rhode Island, hereafter called the model." The 15 Christina Drive house, directly across the street from the subject property, had been constructed by the Defendant from plans and specifications prepared by the Design Group, Inc. of Fall River, Massachusetts.[2]

To purchase the real estate and complete the house, the Plaintiffs made a $95,000 cash down payment and obtained a loan from Commonwealth Mortgage Company (aka Crestar) in the amount of $120,000, secured by a first mortgage. To finance the balance, the Plaintiffs executed a promissory note payable to Medeiros in the principal amount of $65,000, which was secured by a second mortgage on the property.[3]

The Kelleys moved into the house shortly after the closing in April, 1988. Early in 1989, they began to notice problems with the house, including but not limited to: leaks on both the first and second floors; "bouncy" and sagging floors; numerous surface cracks on the walls and ceilings; and door frames warping out of alignment.

As a result of these visible deficiencies, the Kelleys contacted John Martin, owner of the Design Group, Inc., to ascertain the nature and extent of their problem, and to prepare a report. After seeing Martin's report, the Kelleys contacted Peter Guimond, a professional engineer, to provide a more detailed structural assessment of the house, and to recommend corrective action. Guimond completed his report in October, 1989. *See* Plaintiffs' Exhibit 7. He recommended a litany of necessary repairs:

1. Strengthening the main gable roof rafters by adding full-length $2'' \times 10''$s alongside the existing $2'' \times 6''$s;

2. Adding a ridge beam and posts to the cathedral ceiling over the living room;

3. Reinforcing second floor joists spanning over fifteen feet;

4. Replacing the garage door header;

5. Installing additional beams and posts in the garage ceiling;

6. Replacing the living room floor beam;

7. Removing and rebuilding the exterior balcony deck;

8. Extending the front sections of the roof toward the chimney;

9. Removing and rebuilding the chimney cap, broken flu tile, and installing masonry fill;

10. Replacing kitchen floor tiles;

11. Replacing "floating floor" and reinstalling per manufacturer's specifications;

12. Installing proper cross bracing in first floor ceiling.

With Guimond's report in hand, the Kelleys hired a contractor, Brian Bennett, in December, 1989 to perform the work recommended in the Guimond report. Bennett's estimate to do said repairs was $72,000. During the course of Bennett's work, the house's structural system was further exposed, and this revealed additional structural and building code deficiencies. On January 15, 1990, Guimond reinspected the house, and as a result, he concluded in a January 19, 1990 letter that "[e]very area of the framework I was able to inspect has serious flaws and framing errors, of such a degree as to render the house unsafe and

---

2. Oddly, while the plans and specifications for the subject house were to be those used for the 15 Christina Drive house, no evidence was introduced to the effect that the "model" suffered from similar deficiencies, and no comparison was made, by either party, between the structures.

3. The total amount due under the note to Medeiros, as of the under advisement date, is $21,776.43 including interest.

unfit as a residence." Plaintiffs' Exhibit 12.

In response to Guimond's latest engineering assessment, the Kelleys authorized Bennett to make only those repairs necessary to stabilize the structure. They also requested an updated estimate from Bennett, which he provided—$120,000 in addition to the $27,000 already completed and paid for. *See* Plaintiffs' Exhibit 13.

## DISCUSSION

Plaintiffs challenge the validity of Medeiros' lien, on the ground that there has been a total failure of consideration, *i.e.*, that Medeiros' work was so fundamentally flawed and defective as to require a finding that, as constructed, the house conferred no benefit on the Plaintiffs. We reject this argument for the reasons given in our Order of February 26, 1991 granting Medeiros's motion for involuntary dismissal of the Kelley's claim for rescission. We held then that "[w]hile we are far from impressed with the quality of Defendant's work, especially in light of his candid admission that structural members were omitted or installed without consideration of proper loading calculations [and] without reference to the State Building Code, we are not satisfied that the degree of inadequacy has sunk to the level necessary for a finding of rescission." *Kelley v. Medeiros (In re Kelley)* at 4, AP No. 90–1068 (Bankr. D.R.I. February 26, 1991). In *Turner v. Domestic Investment and Loan Corp.*, 119 R.I. 29, 375 A.2d 956 (1977), the Rhode Island Supreme Court held that rescission is appropriate "where the inadequacy of consideration is so glaring as to shock the conscience of the court." *Id.* at 34, 375 A.2d at 959. We held in *DeRosa v. Boston Bakery & Italian Food Specialty, Inc. (In re DeRosa)*, 98 B.R. 644, 647–48 (Bankr.

D.R.I.1989) (citations omitted), that a contract may be rescinded if there is fraud in the inception, or if there is a substantial breach.

 There being no allegation or proof of fraud by the Defendant herein, we look to evidence of the breach itself. "A substantial breach occurs where the essential objects of the contract are destroyed or where the breach is so 'fundamental and pervasive as to result in substantial frustration.'" *DeRosa*, 98 B.R. at 648 (citing *In re Best Film & Video Corp.*, 46 B.R. 861, 873 (Bankr.E.D.N.Y.1985)). We reiterate that while the quality of Medeiros' construction of the house is far below industry standards, we do not find that the deficiencies in the house as completed "destroy[ ] the entire purpose for entering into the contract." *In re Fahnders*, 66 B.R. 94, 95–96 (Bankr.C.D.Ill.1986). Similarly, we conclude that there cannot be a total lack of consideration if the structure is repairable, or if there is some reasonably salvageable value. We find, based on the evidence, that measures can be taken (and indeed, many have been) to repair the Kelley's house, without rebuilding from the ground up.[4] All the experts testified to methods of repair and, except for Mr. Guimond, to the cost of such work.[5] Based upon the above findings, and since no other grounds have been asserted regarding the validity of Medeiros' security interest, the Plaintiffs' challenge to the actual validity of the lien must be denied.

 Having said that, we are nevertheless required to determine the amount of the underlying debt. When damage to real estate is temporary and can be repaired, the cost of repair is the appropriate measure of damages, when expressed by an expert.[6] *Tortolano v. DiFilippo*, 115

---

4. The Rhode Island Supreme Court has reaffirmed previous case law holding that in situations where the contractor's performance is worthless and has to be redone completely, the contractor is liable for the cost of having the job redone. *National Chain*, 487 A.2d at 135 (citing *DiMario v. Heeks*, 116 R.I. 44, 351 A.2d 837 (1976)).

5. In fact, all three contractors testified to being in a position to perform the stated work for their respective estimates, and in fact are ready and willing to do so.

6. Expert testimony must be predicated on facts legally sufficient to form a basis for the expert's conclusion. *State v. Boucher*, 542 A.2d 236, 239 (R.I.1988) (citing *State v. Fogarty*, 433 A.2d 972, 977 (R.I.1981)). Once the Court has accepted

R.I. 496, 349 A.2d 48 (1975). The costs incurred in remedying such a breach are unreasonable when material and labor are expended beyond what, in reason and good workmanship, was contemplated by the original contract. *Rhode Island Turnpike & Bridge Auth. v. Bethlehem Steel,* 119 R.I. 141, 165, 379 A.2d 344, 356 (1977). Here, the original agreement contemplated the construction of a house in accordance with referenced specifications. Neither side's expert testified to anything beyond restoring the property to those original specifications. The injured party is simply to be placed in the position he/she would have been in had the contract been fully performed as promised. *Id.* at 166, 379 A.2d at 357.

▉ Damages must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures, and cannot rely on speculation. *National Chain Co. v. Campbell,* 487 A.2d 132, 134 (R.I.1985). *See also White v. Le-Clerc,* 444 A.2d 847, 850 (R.I.1982) (citing *Alterio v. Biltmore Construction Corp.,* 119 R.I. 307, 314, 377 A.2d 237 (1977) (award of damages must rest on legally competent evidence establishing the nature and extent thereof, and may not be the result of conjecture)); *Rhode Island Turnpike,* 119 R.I. at 167–68, 379 A.2d at 358 (probable estimates required; not mathematical exactitude). Here, the Court has been presented with a wide range of repair estimates from the experts.[7]

In our view, Mr. Bennett's estimate is seriously flawed in several respects. Part of his estimate is for work not contemplated by the contract, and as such is not compensable. Neither can we credit in full the $27,000 of work completed by Bennett, since a number of those items were also for work not contemplated by the contract. Additionally, Bennett's estimate includes a 25% markup for overhead and profit, all on top of a 30% "cushion." So, Bennett's repair estimate of $120,550 must be reduced by at least the value of the excess work and the cushion.

While there is support for the proposition that greater weight should be given to the plaintiff's expert when the performance is in an unworkmanlike manner,[8] we cannot disregard the shortcomings in Bennett's approach, nor his brief experience in the construction business in this country.[9]

Predictably, the estimates of Carroll and Marks submitted on behalf of the defendant are considerably lower than Bennett's. We find Carroll's $11,270 estimate to be far too low. His conclusions failed to withstand scrutiny in several respects, especially as to the cost of repairing the chimney, and we find that he substantially understated the amount of work necessary to restore the Kelleys to where they would have been, with proper workmanship. The lack of detail regarding substantial items such as the chimney does irreparable damage to Mr. Carroll's opinions and conclusions.

Marks' $72,729 estimate, per Guimond's report, seems otherwise consistent with Bennett's estimate, if the 30% cushion and

---

the expert's capacity and qualification, it is free to weigh the conflicting testimony and accept or reject each accordingly. *Socony–Vacuum Oil Corp. v. French,* 88 R.I. 6, 143 A.2d 318 (1958). *See also Delta Airlines v. United States,* 561 F.2d 381, 394 (1st Cir.1977) (court is entitled to weigh the conflicting expert witness testimony and to draw all reasonable inferences from the credited testimony).

**7.** All the experts have complied with the standard set forth in *Lacey v. Edgewood Home Builders,* 446 A.2d 1017, 1019 (R.I.1982) and provided a "reasonably detailed breakdown of the cost of repair," including labor, materials, overhead, and profit.

**8.** *See, e.g., Labrecque v. Branton Yachts Corp.,* 457 A.2d 617 (R.I.1983) (nearly the full amount of plaintiff's estimate was awarded for the cost of repair to make a boat seaworthy, with a "good amount" of the award consisting of undoing work done by the contractor); *Franklin & Archambault, Inc. v. DiFranco,* 111 R.I. 526, 304 A.2d 901 (1973) (damages awarded to homeowners for money spent hiring other artisans as result of contractor's failure to complete its job in a workmanlike manner).

**9.** Bennett testified that a large part of his experience in the United States since arriving from New Zealand in 1983, was in the boatbuilding industry. He testified to having completed only three new houses here, but has completed many "remodeling jobs."

markup thereon are deducted, which would result in a figure of $75,000. Deducting from that the cost of work outside the contract, Bennett's estimate is nearly identical to Marks'.

As a result, we find that the minimum cost to make necessary repairs is *at least* the current amount of Medeiros' lien, even including collection costs and attorneys' fees. We, therefore, rule: (1) that Medeiros' mortgage, although technically valid, must be discharged, since there is no underlying debt to support the lien. *See* R.I. GEN. LAWS § 34-26-2; and (2) Medeiros' counterclaim is dismissed.[10]

Enter Judgment consistent with this opinion.

---

**10.** The Kelleys may proceed against Medeiros on their claim for rescission and damages for breach of contract pending in the Rhode Island Superior Court.