**In re NEWPORT OFFSHORE, LTD., Debtor.**

**Bankruptcy No. 85–00723.**

United States Bankruptcy Court, D. Rhode Island.

July 7, 1993.

Matthew McGowan, Salter, McGowan, Swartz & Holden, Providence, RI, for trustee, Robert Cataldo.

Gordon P. Cleary, Vetter & White, Providence, RI, Sp. Counsel for trustee, Robert Cataldo.

Thomas A. DiLuglio, Providence, RI, for claimant Sumner Long.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on the Chapter 11 Trustee's Objection to Claim of Sumner A. Long. Long alleges that Newport Offshore, Ltd. (NOL) negligently repaired and made improper and unauthorized modifications to his yacht, breached its contract by not following specifications, otherwise violated the terms of his contract with Newport Offshore, Ltd., and that he was damaged thereby. The Trustee contends that NOL fully performed its contractual obligations, honored its warranties under the contract, and is not indebted to Mr. Long.

### TRAVEL

Initially, Sumner Long was pursuing this cause of action in the United States District Court for the District of Rhode Island against NOL and its liability carrier, Insurance Company of the State of Pennsylvania, which was denying coverage. When NOL filed its Chapter 11 petition, we permitted Long's pending action to proceed against the insurer in the District Court. Thereafter, the parties entered into a stipulation in October 1987, tentatively fixing Long's claim in this Court at $951,000, solely for the purpose of expediting a distribution to creditors, and agreeing that the actual amount of said claim would be determined when the litigation with the insurer was concluded. On July 24, 1990, the District Court held that NOL's insurance did not cover Long's alleged claims, and this decision was affirmed by the First Circuit Court of Appeals. We are left now to determine the merits of Long's claim against NOL.

### BACKGROUND

During 1980 and 1981 Long and his naval architect, Professor Jerome Milgram of the Massachusetts Institute of Technology Department of Ocean Engineering, had designed Long's latest in a series of ocean racing yachts, which was intended to be campaigned worldwide. In July 1981, Long took delivery of his custom built, International Offshore Rule Maxiboat, *Ondine*, from Wisconsin shipbuilder Palmer Johnson, Inc., for the price of $1,500,000. After a disappointing initial race, *Ondine* was returned to Palmer Johnson for structural reinforcement of the lower forward portion of the hull which had not withstood the stresses of ocean racing. Thereafter, at the conclusion of an undistinguished first racing season, *Ondine* was left with a number of structural and construction defects that rendered her unseaworthy, and Long brought these complaints to the builder.

In the Spring of 1982, after negotiations, Long settled with and released Palmer Johnson of its warranty obligations for $250,000, and at about that same time was persuaded by Andrew MacGowan of NOL to leave *Ondine* in Newport, Rhode Island, upon representations by MacGowan that NOL would correct Palmer Johnson's mistakes and make the boat "competitive." Based upon this handshake agreement, NOL received the boat in June 1982, and had extensively dismantled it prior to the execution of a written contract, which was eventually signed on September 30, 1982 by Long, and on October 5, 1982 by NOL. (Trustee's Ex. A, at A2.)

Numerous disputes arose early on between Long and NOL, and continued throughout the course of the repairs, particularly regarding the weight of the boat and the position and installation of the propeller shaft. Notwithstanding these differences, NOL completed the contract and in January 1983 Long accepted delivery and headed south, intending to race the boat in the 1983 Southern Ocean Racing Circuit (SORC). Shortly after departure, however, while en route to "the races," *Ondine* was nearly lost when she began taking on water at the rudder shaft penetration. (Casualty Inspection Report, Long's Ex. 8, at 1.) It was only through the exercise of very

expert seamanship that the crew averted a sinking and managed to get the vessel to the Derecktor Gunnel Shipyard in Ft. Lauderdale, Florida, where emergency repairs were done. NOL paid for the repairs pursuant to the contract, which stated "the builder, within normal allowances for this type of racing yacht, will warrant for one year the integrity and the seaworthiness of the work they undertake, including no further oil canning."[1] (Contract, Trustee's Ex. A, at A2.)

After the Derecktor Gunnel repairs, Long continued to race *Ondine* for three years, with mediocre results, until 1985 when, in recognition of the fact that the *Ondine* was not a winner, he sold it as a cruising boat for $298,500. Long contends that as a result of: (1) NOL's failure to follow the repair and modification specifications in the contract; (2) negligent repair work, cold welds, etc.; (3) the addition of unnecessary weight; and (4) improper installation of the propeller shaft and tube, *Ondine* was virtually destroyed for its intended purpose as a competitive International Offshore Rule Maxiboat. As a result, Long alleges, he has been damaged in the amount of $1,271,187, plus interest at the rate of ten percent per annum since January 1983, for a total claim against NOL of $3,297,131.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ From the outset, *Ondine* was not the racing yacht envisioned by Long and Milgram. The survey done at the NOL shipyard on September 16, 1982, by A. Johnson and Associates (Trustee's Ex. B), which we regard as competent and objective, establishes the defective condition of the boat shortly after *Ondine's* first racing season, and *prior to* any repairs by NOL. Captain Johnson's survey states, inter alia, that:

13. It was observed throughout the vessel, particularly on the longitudinal flat

bar, that the welding was sporadic and very sparse.... It is apparent that no attempt was made to accomplish 100% welding, on any portion of the hull frame structure, during construction.

.   .   .   .   .

20. Overall on deck, the surface has a very soft and flexible feeling, and in most all areas, gives underfoot, leaving a feeling of deficiency and insecurity.

.   .   .   .   .

*Conclusions and comments:*

.   .   .   .   .

D. In her present condition, "Ondine" is not considered structurally sound or seaworthy....

.   .   .   .   .

The presence of topside exterior cracks amidship are probably the symptoms of failure or incipient failure....

.   .   .   .   .

The structural problems of this vessel are apparently multiple. Certainly the welding of frames and longitudinales was inadequate throughout most of the hull. The structure is also characterized in certain by a lack of structural continuity and compensation of structural cutouts, that are either designer or builder oversights....

.   .   .   .   .

We conclude that "Ondine's" hull structure lacks sufficient strength for a vessel of this size, in the service for which it was utilized. It is apparent that the quality of construction is deficient in many areas, including insufficient welding, apparent distortion of shell plate, due to improper construction techniques, and insufficient allowances made for scantlings and structural components, considering the stresses involved in this type of vessel, considering the service for which it was intended.

---

1. "Oil canning" is a term used to describe indentations in the skin of the vessel, between the structural members, caused by the hull pounding against the sea. One of NOL's obligations under the contract was to correct such "oil canning," and it did this by adding lots of putty filler, but at an unacceptable cost in additional weight.

(A. Johnson and Assocs. Sept. 27, 1982 Survey, Trustee's Ex. B.)[2] The essence of Long's case is that NOL defaulted on its promise to transform *Ondine* into a competitive maxiboat through structural repairs and changes, and by implementing weight saving measures. While such a promise cannot easily be identified in the contract or from the evidence, we do find that NOL understood that its obligations included more than merely delivering a seaworthy sailboat, and that it certainly was aware of Long's intention to race *Ondine* competitively. Kim Roberts, NOL's manager of the *Ondine* project, conceded that he understood Long's concern with boat speed, and that all repairs and modifications were done with International Offshore Racing Rules in mind. The evidence is clear that NOL promised to deliver a "competitive" racing yacht. The evidence does not, however, support a finding that NOL promised to deliver a yacht of a specific weight. To the contrary, the agreement is that NOL was *not* bound by the weight limits appearing in the contract, as all such references were followed by the caveat, "NOL will not be bound by this limit if it deems it necessary to add structure." (Contract, Trustee's Ex. A, at A3, A5.) This language clearly left NOL with wide discretion as to weight when making modifications or repairs, and while this may create an irreconcilable conflict vis-a-vis the delivery of a weight-sensitive racing boat, the language is clear, Long agreed to it, and we may not ignore it in these deliberations.

◼ While this contract, from Long's standpoint especially, is sorely lacking in detail, we note that contracts for work or services carry with them the implied duty to perform "skillfully, carefully, and diligently and in a workmanlike manner, and that a negligent failure to observe any of those conditions is a tort as well as a

breach of contract." *Davis v. New England Pest Control Co.*, 576 A.2d 1240, 1242 (R.I.1990). Based upon the entire record, we find that NOL did not perform its obligations either skillfully or in a workmanlike manner, and conclude that its actions constitute negligence as well as breach of contract. Specifically, for example, Captain Johnson testified that NOL had assigned two different welding crews to work on *Ondine*—one that was competent and experienced—and which accomplished the construction of the new stern, and another that was less skillful, and which, unfortunately, performed most of the repairs in question. Johnson testified that there was no comparison between the work of the two crews, and that the "second string" welders made numerous low amperage, cold welds that were brittle and subject to cracking.[3] Johnson also testified that in his opinion NOL was not equipped to perform the contract with Long and at the same time continue with its other work in process. Johnson stated that the only way NOL could have properly completed this contract was by stopping its other work and focusing all of its resources on *Ondine*, and this it did not do.

In addition, there is evidence that NOL had agreed to consult with and follow the recommendations of Long's naval architect, Jerome Milgram. Professor Milgram testified, however, that he was not kept apprised of problems that developed during the project, and was rarely contacted by NOL even though he was continuously available for consultation and advice.

One such problem involved the positioning of the propeller shaft and tube through the new keel. The contract required NOL to "remove and reinstall *as was* the propeller, shaft V-drive and the jackshaft." (Contract, Trustee's Ex. A, at A2.) (emphasis added). When NOL received Milgram's keel drawing showing the position of the

---

**2.** The wisdom of Long's releasing Palmer Johnson for $250,000 in 1982 looms as an increasingly large question in light of the Johnson and Associates' report, but that is not in issue here.

**3.** When *Ondine* nearly sank, the failure involved many cold welds. Captain Johnson stated in his casualty report "[t]he quality of the welding and

the sloppy fit of added structural components have detracted from what otherwise could have been a fully satisfactory repair. Many cold welds were noted, some of which had already failed." (C. Johnson and Assocs. Casualty Inspection Report, Claimants Ex. 8, at 4.)

shaft and tube, essentially as it existed in the original keel, the rearmost bolt was pictured going through the shaft. Milgram acknowledged the problem, since the bolt as pictured would prevent shaft rotation, but says he informed NOL that it would be acceptable to position the shaft per his plan and just eliminate the bolt in question. "There were plenty of other bolts to do the job, and that this one would not be missed." However, NOL disagreed and, on its own, repositioned the shaft at a steeper angle to accommodate the rearmost bolt. Milgram testified that the result of this unauthorized *and unnecessary* deviation from the plan was a slower less competitive yacht, because the steeper angle of the shaft produced more drag. Milgram testified that his design would have created much less drag, would have resulted in the same handicap credit, and better boat speed, and we accept his testimony in this regard. We find that all of these actions by NOL constituted negligence and breach of contract, specifically with regard to the positioning of the propeller shaft and the manner in which weight was removed from the keel.[4]

■ The Trustee also contends that Long has waived such claims because he failed to assert these problems at the Derecktor Gunnel Shipyard in Florida in early 1983. Because the record is unclear as to whether, or which of these problems first became known to Long, we find that Long's actions (or inactions) did not result in a waiver of any claims.

### DAMAGES

Long now asks that he be awarded over Three Million Dollars in damages as a result of NOL's actions. While the Claimant has easily met his burden with regard to negligence, breach of contract, and breach of implied and express warranty, he has failed to provide any competent evidence as to damages, even with several reminders from this Court, both during the hearing and prior to its conclusion.

■ We have previously held that "[d]amages must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures, and cannot rely on speculation." *Kelley v. Medeiros (In re Kelley)*, 131 B.R. 532, 534 (Bankr.D.R.I.1991); *see also National Chain Co. v. Campbell*, 487 A.2d 132, 134–35 (R.I.1985); *Reliance Steel Prods. Co. v. National Fire Ins. Co.*, 880 F.2d 575, 578 (1st Cir.1989). Contract damages are awarded to give the injured party the benefit of the bargain. "If defective or partial performance is rendered, the loss in value caused by the breach is equal to the difference between the value that the performance would have had if there had been no breach and the value of such performance as was actually rendered." Restatement (Second) of Contracts § 347 cmt. b (1981). If the value of performance is too difficult to measure, the Restatement says,

> [i]f a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on
>
> (a) the diminution in the market price of the property caused by the breach, or
>
> (b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.

Restatement (Second) of Contracts § 348 (1981).

Long argues that NOL ruined *Ondine* as an International Offshore Rule Maxiboat, and he appears to be seeking damages for diminution in the market value of the boat. Mr. Long testified that he could have sold *Ondine* in June 1982, prior to NOL making any repairs, for $1,250,000 (i.e. $1,500,000 less the warranty value of $250,000), and from this figure he estimates that an average depreciation of 6.95 percent per year should be deducted. This derives from his estimate of the average depreciation of two

---

**4.** Professor Milgram testified, and we agree, that when removing weight from the keel, it should be taken from as high a station as possible, thereby leaving the ballast low, resulting in better performance to windward. Curiously, NOL did pretty much the opposite.

similar yachts, *Nirvana* and *Sovereign*.[5] Applying said depreciation for 1.5 years (the period between delivery from Palmer Johnson in July, 1981 until delivery from NOL in January, 1983), Long submits that the depreciated value of *Ondine* as of January 1983 was $1,119,687.[6] From the depreciated value, Long subtracts the $298,-500 he received from the sale of *Ondine* and adds the cost of the NOL repairs in the amount of $450,000, resulting in a damage claim of $1,271,187, plus interest in the amount of $2,025,944.

We find serious fault with Long's method of figuring damages, which although mathematically correct, is solely the result of his personal, but unsupported calculations. Mr. Long is certainly an experienced sailor, and is a charming and engaging person, but his testimony on the damage issue is legally and factually deficient. To begin with, his statement that he could have sold *Ondine* for $1,250,000 prior to NOL's repairs is totally without foundation,[7] and may not serve as the starting point for all of his subsequent calculations. Further, there is no evidence to suggest that *Ondine's* problems, prior to NOL's repairs, were curable or that she could, even with modifications, have become the competitive racing yacht contemplated by Long and Milgram. In addition, the depreciation figures used by Long are irrelevant, as there is no evidence that *Nirvana* and/or *Sovereign* were at all similar to *Ondine*, or that the economic conditions or the maxi-ocean racing yacht market at the relevant times were comparable. Had there been objection to any of this testimony while it was being proffered, we would not be dealing with it now.

■ We also find that the damages claimed by Mr. Long are clearly excessive. The evidence does not support the argument that NOL's actions resulted in the "total destruction" of *Ondine* as a competitive International Offshore Rule Maxiboat. To the contrary, the evidence is that, from its inception, *Ondine never* enjoyed that status. The damage claim is also defective because Long failed to establish the cost to repair the boat after it left the Derecktor Gunnel Shipyard in Florida. Long's testimony is that he did not attempt to correct or even to quantify NOL's misdeeds because, he vowed, "not to spend another penny" on *Ondine*. In short, there is no competent evidence to guide us in assessing damages in this action, and we are therefore required to find, and reluctantly conclude, that the Claimant has not met his burden of proving damages with a reasonable degree of certainty. *See In re Kelley*, 131 B.R. at 534.

■ We have considered and examined the possibility of awarding some amount of damages based upon the entire record, especially the information contained in the Casualty Inspection Report (Long Ex. 8), but any such action on our part would be mere speculation, as the record does not furnish a basis for doing so.

Accordingly, for the foregoing reasons, Sumner A. Long is awarded nominal damages only, in the amount of $1,000.

Enter Judgment consistent with this opinion.

---

5. Long actually testified that the average depreciation of these two yachts, based on their purchase prices and selling prices, is 7.6% per anum. It was his post-trial memorandum that contains the figure 6.95%, with no explanation for the difference.

6. 1.5 years × 6.95% per anum = 10.425%; Depreciation: $1,250,000 × 10.425% = $130,313;

Depreciated value of *Ondine*: $1,250,000 − $130,313 = $1,119,687.

7. Remember, at the time in question, *Ondine* was unseaworthy, was suffering from multiple construction defects, and had never raced well. Therefore, the cost to build the boat has no bearing whatsoever on its market value as of January 1983.