## In re AMERICAN SHIPYARD CORPORATION, Debtor.

### Stephen S. GRAY, Chapter 11 Trustee, Plaintiff,

### v.

### WATER STREET CORPORATION and Harbor Marine Corporation of Rhode Island, Defendants.

Bankruptcy No. 96–11753.
Adversary No. 97–1093.

United States Bankruptcy Court,
D. Rhode Island.

April 22, 1998.

Harold B. Murphy, D. Ethan Jeffery, Hanify & King, Boston, MA, for Plaintiff.

Douglas A. Giron, Temkin & Associates Ltd., Providence, RI, for Defendants.

Sheryl Serreze, Assistant United States Trustee, Providence, RI, Office of the U.S. Trustee.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

Heard on the Chapter 11 Trustee's complaint for breach of contract against Harbor Marine Corporation and Water Street Corporation seeking damages allegedly caused by the Defendants' failure to reposition two Army tug boats from Curtis Creek, Maryland, to the Debtor's repair facility in Newport, Rhode Island. The trial of the Trustee's damage claim was combined with Harbor Marine's request for administrative expenses of $14,125 for the costs incurred in attempting the tow. For the reasons discussed below, we rule: (1) that Harbor Marine breached the contract and is liable for damages in the amount of $24,553; and (2) Harbor Marine's request for administrative expenses is DENIED.

## BACKGROUND

On May 31, 1996, American Shipyard Corporation filed a voluntary Chapter 11 petition and on June 11, 1996, Stephen Gray was appointed the Chapter 11 Trustee. On September 30, 1996, the Debtor was awarded contracts to repair two United States Army Reserve tug boats: the LT 802, Major General Henry Knox; and the LT 805, Major General Winfield Scott. The agreement, with time of the essence, required the Debtor to move both tugs from Curtis Creek, Maryland, to its repair facility in Newport, Rhode Island.

Initially, the Debtor had contracted with another company, Conrad Roy, to accomplish the move for a price of $15,000 per vessel. On October 23, 1996, after an unexplained delay on its part, the Army activated the contracts and alerted the Debtor that the vessels were ready to be picked up. Because this notice came two weeks later than originally announced, Conrad Roy had accepted another job and was no longer available. Scrambling for a substitute, on October 25, 1996, the Debtor called Raymond DiSanto of Harbor Marine Corporation to see if it could perform the tow, and DiSanto agreed to do the job for the same price as Conrad Roy. On October 29, 1996, Harbor Marine dispatched its two tugs, the "Ray Me" and the "John B" to Maryland. On November 1, 1996, Harbor Marine began the trip to Newport, but when the "Ray Me" encountered engine problems, both Harbor Marine tugs returned to Baltimore Harbor, with the Army ships in tow. The "Ray Me's" engine was repaired but, because of their size, Harbor Marine decided that its tugs could not safely tow the Army vessels to Rhode Island, left both of them at the dock in Curtis Creek, Maryland, and, without notifying American Shipyard, returned to Newport empty handed.

On November 2, 1996, David White, American Shipyard's dock master, called Harbor Marine to ask how the tow was proceeding, and DiSanto informed him for the first time that the Army tugs had been returned to Curtis Creek. To avoid delay back charges by the Army, White needed to find another company to perform the tow, and on short notice, but at a premium price, hired Bay State Towing Company to do the job for $27,000 per tug, and had the Army vessels in Newport by November 8, 1996. The Debtor seeks the following damages: (1) the difference between its contract price with Harbor Marine, and what it paid the Bay State Towing Company to complete the tow—$24,000; (2) the cost to send David White a second time to Maryland to prepare the Army tugs for towing—$553; and (3) back charges assessed by the Army for contract delays—$13,410.

## DISCUSSION

Harbor Marine denies liability on the ground that both Harbor Marine and American Shipyard were under the erroneous belief that Harbor Marine could perform the tow, while in fact it did not have that capability. It is undisputed that the Harbor Marine

tugs were not powerful enough to tow the two Army tugs, but Harbor Marine makes the curious argument that its inability to perform should be excused on the ground of mutual mistake,[1] i.e., that when American Shipyard hired Harbor Marine to do this job, American Shipyard should have known that Harbor Marine could not perform, and that, therefore, the contract was never finalized.

To reform an agreement or to excuse performance due to mutual mistake,

> it must appear that by reason of a mistake, common to the parties, their agreement fails in some material respect correctly to reflect their prior completed understanding. ... A mutual mistake is one common to both parties wherein each labors under a misconception respecting the same terms of the written agreement sought to be canceled.

*Dubreuil v. Allstate Ins. Co.,* 511 A.2d 300, 302–03 (R.I.1986) (citations omitted); *see also In re Pub Dennis of Cumberland, Inc.,* 142 B.R. 38, 40 (Bankr.D.R.I.1992). "[I]t is well settled that the complainant must prove a mutual mistake by clear and convincing evidence." *Vanderford v. Kettelle,* 75 R.I. 130, 64 A.2d 483, 489 (1949).

The evidence in this case is that American Shipyard needed to get the tugs to its facility immediately upon activation of the contracts, in order to complete the repairs within the time allowed. Under the agreement, American Shipyard had seven days to move the vessels, and then the performance period would commence, see Plaintiff's Exhibits 13 & 14, and Harbor Marine's default used up 5 of those days. Henry Nardone, CEO of American Shipyard, and Dock Master David White testified, based upon industry standards and practice, that towing arrangements usually consist of informal agreements between the parties, often by telephone. White stated that on October 25, 1996, he relayed the specifications of the Army vessels to Ray DiSanto at Harbor Marine, who in turn referred him to Captain

Robert Oatway, the person in charge of the moving operation. Except for the length of the tugs, Oatway and DiSanto deny being given any specifications. Oatway candidly admitted, however, that when he is called to do an ocean tow, if the specifications are not provided, he would normally acquire that information on his own. He does not remember what happened in this case, or why he never came into possession of that information. On October 29, 1996, Oatway left for Baltimore and even after seeing the tugs at the dock, expressed no reservation about being able to accomplish the tow.

This was not a case of mutual mistake, but rather a garden variety inability to perform by Harbor Marine, which does not excuse it from its obligation under the contract. We find as a fact and conclude as a matter of law that American Shipyard had no duty to investigate and/or determine that Harbor Marine was not capable of performing the contract. Quite to the contrary, if American Shipyard had made such a determination, and backed out of the contract on that ground, it would in all likelihood be the defendant in a breach of contract action by Harbor Marine.

"The underlying rationale in breach-of-contract actions is to place the innocent party in the position in which he would have been if the contract had been fully performed." *National Chain Co. v. Campbell,* 487 A.2d 132, 135 (R.I.1985). The award of contract damages is intended to give the non-breaching party the benefit of its bargain. *In re Newport Offshore Ltd.,* 155 B.R. 616, 620 (Bankr.D.R.I.1993), *aff'd,* 24 F.3d 353 (1st Cir.1994). "Damages must be proven with a reasonable degree of certainty, and the plaintiff must establish reasonably precise figures, and cannot rely on speculation." *Kelley v. Medeiros (In re Kelley),* 131 B.R. 532, 536 (Bankr.D.R.I.1991); *see also Newport Offshore,* 155 B.R. at 620; *National Chain Co.,* 487 A.2d at 134–35;

---

**1.** The Defendants also argue that Harbor Marine's ability to perform the tow was a condition precedent to its becoming obligated to perform services under the tow agreement. According to Harbor Marine, because it did not have the abili-

ty to tow the Army tugs, the condition precedent was never satisfied and therefore its obligation to perform never matured. We rejected this argument when it was made at the trial, and reaffirm that ruling here.

*Reliance Steel Prods. Co. v. National Fire Ins. Co.,* 880 F.2d 575, 578 (1st Cir.1989).

American Shipyard contracted with Harbor Marine, reasonably believing the tow would be completed in a competent, timely fashion, and as discussed earlier, Harbor Marine has failed to establish the existence of a mutual mistake that would nullify the contract. To find a mutual mistake in this instance would amount to relieving a breaching party from its obligations on account of its own incompetence. Here, Harbor Marine breached its agreement with American Shipyard and is liable for the damages resulting therefrom.

It is undisputed that American Shipyard paid Bay State Towing $54,000 to move the Army vessels, or $24,000 more than the contract price with Harbor Marine. Given the time constraints under which American Shipyard was working, and because Harbor Marine compounded the time problem by failing to immediately notify American Shipyard of the problems it was experiencing, we find that the extra $24,000 expended by American Shipyard, although pricey, was unavoidable. Additionally, we find that the $553.59 required to send White to Baltimore to prepare the ships for tow a second time is a direct consequence of Harbor Marine's breach. See Plaintiff's Exhibits 20–22.

Regarding its claim for delay damages, we find that American Shipyard has not met its burden on this item. The evidence is unclear as to why the Army imposed delay charges of four days totaling $6,360 on the LT–805 and six days totaling $9,540 on the LT–802. Plaintiff's Exhibits 23 and 24 do not shed any light as to why these charges were assessed, and the testimony of Richard Wilkinson, Contracts Manager for American Shipyard, is equally unenlightening. Mr. Wilkinson said that there were six days of delay on account of weather—four due to rain, and two for high winds. Additionally, there were delays for "coupling work." He stated that the Army excused the weather delays and the delay for the coupling work, and that any unexcused delays were attributed to subcontractors. Adding to the confusion, the Complaint alleges that delays of four and one-half days on each contract are attribut-

able to Harbor Marine's breach. This contradicts the delay charges asserted in Exhibits 23 and 24. There has been a failure of proof on this issue and, consequently, we make no award for delay damages.

Finally, the Defendants argue that any award of damages should run solely against Water Street Corporation because that is the entity with whom the Debtor contracted. See Plaintiff's Exhibits 6 & 7. We disagree. White testified that he called Harbor Marine directly to arrange for the tow and that DiSanto requested, for internal reasons of concern only to him and his solely owned corporations, that the purchase orders be in the name of Water Street Corporation. DiSanto, the sole shareholder and president of both Water Street and Harbor Marine, stated that Harbor Marine owned the tugs that would be used, and that Water Street Corporation primarily buys and sells real estate and presently owns a restaurant. Additionally, Harbor Marine invoiced the Debtor for the services rendered, and it is Harbor Marine which filed the application for administrative expenses. See Plaintiff's Exhibit 15 and Application for Administrative Expense, Docket No. 217. Based on the uncontradicted evidence, we find and conclude that Harbor Marine is in privity of contract with American Shipyard, and that it is the entity liable for the damages awarded herein.

Finally, we address Harbor Marine's request for $14,125 as an administrative expense claim under 11 U.S.C. § 503(b)(1)(A). This section states:

> (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

> (1)(A) the actual, necessary costs and expenses *of preserving the estate,* including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A) (emphasis added). This request is denied for the simple reason that Harbor Marine failed to establish that its services preserved or benefitted the estate in any manner. In fact, by our ruling above, it is the law of this case that Harbor

Marine's actions have damaged the estate, and its claim for administrative expenses is DENIED.

For the foregoing reasons, judgment shall enter for American Shipyard against the Defendant, Harbor Marine, in the amount of $24,553.59.