In re Stephen D. BLOCK, Debtor.

Marc D. Wallick, Trustee, Plaintiff,

v.

Nicholas E. Cambio and Universal
Properties Group, Inc.,
Defendants.

Universal Properties Group,
Inc., Plaintiff,

v.

Marc D. Wallick, Trustee, Defendant.

Bankruptcy No. 96–11813.
Adversary Nos. 99–1054, 99–1055.

United States Bankruptcy Court,
D. Rhode Island.

Jan. 8, 2001.

Robert D. Wieck, Providence, RI, for Marc D. Wallick, Chapter 7 Trustee.

Brian LaPlante, Carrera, LaPlante & Sowa, LLP, Providence, RI, for Nicholas E. Cambio and Universal Properties Group, Inc.

### OPINION AND ORDER

ARTHUR N. VOTOLATO, Bankruptcy Judge.

### TRAVEL

Heard on February 28, 29, and March 1 and 2, 2000, on two adversary proceedings involving ownership of 44 undeveloped lots in Edgartown, Massachusetts (hereinafter the "Property"). In a nutshell, the Chap-

ter 7 Trustee claims, through the Debtor, a one-half interest in the Property, while Nicholas Cambio, the principal of Universal Properties Group, Inc. (hereinafter "UPG"), argues that the Debtor, Stephen Block, has no equitable interest in the property, that he appears as a record owner "for convenience only," and that UPG is the legal and equitable owner of the entire Property.

The first adversary proceeding was filed by the Trustee against Cambio and UPG, requesting: (1) that the Defendant UPG's alleged interest in the Property, based upon an unrecorded deed in the possession of the law firm of Adler, Pollock & Sheehan, be declared to be of no force or effect as to the Trustee in bankruptcy; and (2) that the Trustee be authorized to sell the Property pursuant to 11 U.S.C. § 363(h) and to allocate joint liabilities and costs of sale equally between the estate and Cambio/UPG. In response to the Trustee's lawsuit, UPG filed a complaint requesting determinations: (1) that the statute of limitations bars the Trustee from asserting an interest in the Property; (2) that, on the merits, the Trustee has no interest in the Property; (3) that a constructive trust be imposed on the Property for benefit of UPG; and (4) that the Court enter a declaratory judgment that the Trustee is estopped from asserting an interest in the Property. As they arose out of common issues of fact and law, the two adversary proceedings were consolidated and tried together.

Prior to trial, UPG filed a Motion for Summary Judgment, on the ground that the Trustee's Complaint was filed after the statute of limitations had expired, and on October 29, 1999, the motion was denied. On appeal to the United States District Court for the District of Rhode Island, Judge Torres ruled, pursuant to 11 U.S.C. § 546, that the statute of limitations, *if applicable*, did not begin to run until the Trustee learned or reasonably should have learned of a 1996 unrecorded deed on which UPG appears as the sole owner.

### RESULT

Initially, we rely on Judge Torres' ruling that even if the § 546 limitation period applies, the time did not begin to run until the Trustee knew or should have known of the unrecorded deed. After hearing, I find that time to be February 1998, *at the earliest*, making this action timely, in *any* event.

I also rule that 11 U.S.C. § 544(a)(3) is not limited to affirmative use by the Trustee, and that its use as a defensive tool is not restricted by any limitations period. Finally, I find and conclude that as of the date of the petition, Stephen Block was the owner of an undivided one-half interest in the Property. This interest became property of the estate which by operation of law passed to the Trustee, who is hereby authorized to sell the same.

### BACKGROUND [1]

On or about May 7, 1986, Stephen D. Block, Nicholas Cambio, and Steven M. Feingold, as tenants in common, purchased for approximately $1,900,000, property in Edgartown, Dukes County, Massachusetts, known as Vineyard Acres II Subdivision (the "Property"). Block and Feingold each agreed to contribute $50,000 for the acquisition, and each agreed to and did assume personal liability on a mortgage loan from Rhode Island Central Credit Union (RICCU) in the principal amount of $1,890,000. Subsequently, on December 12, 1988, Block, Cambio, and Feingold recorded with the Dukes County Registry of Deeds a quitclaim deed conveying the Property to themselves as joint tenants. On May 1, 1992, Feingold died, leaving Block and Cambio as co-owners of the Property. The record title remained the

1. This opinion constitutes our findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 7052 and 9014.

same until June 1996, when Block filed a voluntary bankruptcy petition, and Marc Wallick, Esq. was appointed the Chapter 7 Trustee. Block did not list any interest in the Property in his bankruptcy statement of affairs or in his sworn schedules.

### The Unrecorded Deed

On or about December 30, 1988, Block, Feingold, and Cambio purportedly executed a deed conveying their interests in the Property to UPG. This deed was not recorded, and as of the date of the trial in this matter supposedly remained in the possession of UPG's legal counsel Adler, Pollock & Sheehan, specifically Edward Maggiacomo, Esq.'s desk drawer. UPG explains that it refrained from recording the deed to avoid paying the Island Land Bank Tax, and argues with no persuasive or credible support that Block had no equitable ownership interest in the Property, and that Block's name was on the deed only "as a matter of convenience."

The Trustee first learned of Block's interest in the Property in February 1998, when he received a copy of a letter from Jacob N. Polatin, Esq. to Charles Beal, Esq. regarding the imminent foreclosure of the property. Polatin wrote:

> we are suspending all activity with respect to the foreclosure auction scheduled for February 25, 1998. . . . I am well aware of the constraints imposed by the automatic stay and have no intention of violating the stay.
>
> Needless to say, our client was not aware of Mr. Block's bankruptcy petition in Rhode Island. While I have not yet received any of the papers in the case, I understand that Mr. Block did not schedule our client as a creditor.

See Defendants' Exhibit 6.

The Trustee learned of the unrecorded deed on June 9, 1998, when he received a letter from Stephen Block's attorney, John Webster, Esq., together with correspon-

dence from UPG's attorney, Edward Maggiacomo, Esq., describing the events that preceded the execution of the unrecorded deed. See Defendants' Exhibit# 7. The Trustee filed his adversary proceeding on May 18, 1999, alleging that as of the date of the filing of the case, Block was a record and equitable owner of this Property, in joint tenancy with Cambio, and that pursuant to 11 U.S.C. § 544(a)(3), Block's interest became property of the estate at that time.

UPG/Cambio contend that even if Block did have an interest in the property, § 546 requires the Trustee to take affirmative action within two years of his appointment, and that it is now too late to assert any alleged interest in the Property. Cambio/UPG also argue that based on the Trustee's June 16, 1998 letter disavowing any interest in the Property, UPG relied to its detriment[2] on the Trustee's statement, and that he should now be equitably estopped from claiming an interest in the Property.

### THE TRUSTEE'S AVOIDANCE POWERS

Under 11 U.S.C. § 544(a)(3), the Trustee's powers with respect to real property are those of a bona fide purchaser of all of a debtor's interests in said property as of the date of the filing of the petition.

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide

---

2. The alleged detriment consists of many unsubstantiated expenses in courting potential purchasers, and developing the property.

purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3). Applying this statute to the facts in this case, the Trustee, as a bona fide purchaser, took title to all property in which Stephen Block held an interest as of the date of the petition, free and clear of all unrecorded conveyances and all equitable liens of which the Trustee had no constructive or actual notice.

It is true that the Trustee's ability to avoid transfers and to exercise his strong-arm powers under 11 U.S.C. § 544(a)(3), is subject to the statute of limitations, 11 U.S.C. § 546, which provides:

(a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A),

and with this in mind, UPG argues that the statute of limitations expired long before May 18, 1999, when the Trustee filed his adversary proceeding.

■ Initially, we conclude that Section 546 is not applicable here because the Trustee is not invoking § 544 in an offensive posture, but rather is asserting said power defensively, in response to Cambio's complaint for declaratory judgment, i.e., answering UPG's claim of ownership of the Property, the Trustee, as a defense, argues that under § 544(a)(3) his position as a bona fide purchaser is superior to UPG's unrecorded interest. According to the Massachusetts recording statute: "a conveyance in fee simple...shall not be valid as against any person, except the grant-

or...and persons having actual notice of it, unless it...is recorded in the registry of deeds for the county or district for which the land to which it relates lies." M.G.L. c. 183 § 4. Therefore, for a conveyance by Block to be valid against the Trustee, the recording would need to have taken place prior to June 5, 1996, when the Trustee assumed the status of a bona fide purchaser. Here, when Block filed his bankruptcy petition, and the Trustee acquired his (Block's) interest in the Property, there was no persuasive or credible evidence to show that Block's interest was less than 50%. Therefore, I find and conclude that said interest was an undivided one-half interest, and it is so ordered.

■ I also agree with and follow those decisions holding that the limitations provisions in Section 546 do not apply when the trustee uses the § 544(a)(3) strong-arm power defensively. "'§ 546(a) is limited to proceedings initiated by a trustee; the section does not bar defensive reliance on the trustee's avoiding powers outside the two-year limit."' *In re Octagon Roofing*, 156 B.R. 214, 219 (Bankr.N.D.Ill.1993) *quoting, In re Coan*, 96 B.R. 828, 831 (Bankr. N.D.Ill.1989). The bankruptcy court in *Badger Lines, Inc.*, held that defensive reliance by the trustee on his avoiding powers outside the two-year limit under § 546(a) is authorized. *See In re Badger Lines, Inc.*, 206 B.R. 521, 527 (E.D.Wis. 1997); *see also* William L. Norton, *Norton's Bankruptcy Law and Practice* § 56:1 (2d ed.1997–2000).

■ Even assuming arguendo that the Section 546 two-year limitations period did apply, the Trustee's action is timely on other grounds. On UPG's appeal of this Court's order denying its motion for summary judgment, Chief Judge Torres stated:

the statute of limitations for the Trustee to commence an action to void a transfer would not begin running until the Trustee learned or reasonably should have learned of the transfer. Otherwise, the

Trustee's strong-arm powers would be negated.... [T]he transferee, by simply remaining silent, could circumvent or negate the Trustee's strong-arm powers by saying nothing and that certainly can't be the law.... So, the question here is whether or when the Trustee learned or should have learned that this deed had been executed by the Debtor and delivered to the Defendants.

Transcript *Cambio v. Wallick,* No. 99–581T, pp. 13–14 (D.R.I.2000), Exhibit A to Trustee's Supplemental Findings of Fact, Docket No. 70. Based on the record in this case, I find that the Trustee could not have reasonably known about the transfer any earlier than February 1998. *See* Trustee's Exhibit D, Letter of February 13, 1998 from Jacob Polatin to Charles Beal; Defendants Exhibit 11, Wallick Aff. ¶ 3. I also find as a fact that the Trustee did not have *actual knowledge* of the unrecorded deed until after June 9, 1998, when he received a letter from James Webster, Esq., together with Attorney Maggiacomo's correspondence. See Defendants' Exhibit 7. The Trustee's testimony is credible on this issue, and UPG has presented no evidence which undermines the Trustee's position.

UPG also argues that the Trustee should have learned of the Debtor's interest in the Property in late 1996 when Rhode Island Depositors Economic Protection Corporation ("DEPCO") deposed Block in an adversary proceeding to determine the dischargeability of its debt. The Trustee did not attend Block's deposition, but he was in continuous contact with DEPCO's attorneys and understood that he would be kept advised of matters of interest to him as Block's bankruptcy trustee. At his deposition Block testified that he gave a deposit on two lots in Martha's Vineyard, that he "didn't have any interest" in the lots, and he "guessed" it was an option. *See* Defendants' Exhibit 16, p. 96. No obvious red flags were raised at either Block's 1996 deposition or at the Section 341 hearing regarding the

existence of an unrecorded deed, and I find that the Trustee acted reasonably by relying on DEPCO's attorneys to alert him to any potential leads. I also find that had the Trustee attended Block's deposition, nothing transpired that should have put him on notice of the Debtor's interest in the Property. Since the Trustee filed his adversary proceeding on May 18, 1999, even if § 546 applies, the statute did not begin to run until February 1998 at the earliest, putting the Trustee's action well within the February 2000 deadline.

■ Next for consideration is UPG's assertion that Block had no equitable interest in the Property. Cambio, testifying at length, and often going far beyond the scope of questions on both direct and cross examination, stated that the parties had "a fluid arrangement that was constantly changing," and that on August 18, 1986, an indemnity agreement was executed between himself, Feingold & Block. Defendants' Exhibit 12. He stated that initially Feingold and Block were interested in only purchasing lots in the subdivision, but that after several visits to the site, both decided they wanted more of an investment opportunity in the project. It was agreed that Block and Feingold would each invest $50,000 *and become personally liable on the $1.8 million RICCU note, in exchange for an interest in the Property.* Cambio testified that when a title issue developed, Block wanted out of the deal, but still agreed to buy two lots. He stated that during the entire process Block knew the Property was being purchased for the benefit of UPG, that Block paid a deposit of $10,000 for two lots, that Block's name was kept on the deed to the Property only "as a convenience," that Block signed personally on the $1.8 million RICCU Note because "it was too late to change the paper work," and that he believed Block's $10,000 investment had been "rolled into another deal."

Cambio also testified that Block never had to worry about his liability on the $1.8 million RICCU Note because he had

Nick's promise of indemnity, *see* Defendants' Ex. 12, and that in May 1986, *his* (Cambio's) net worth was $40 million, suggesting that his promise was as good as gold. The indemnity agreement states in part, "I, Vincent Cambio and Roney Malafronte agree to hold you harmless and indemnify you (Block) from any liability whatsoever arising out of the Mortgage Loan." Exhibit 12, p. 1. This indemnity can very reasonably be read to mean that only Vincent Cambio and Roney Malafronte are providing the indemnity,[3] but even if all three parties were indemnitors, the only evidence of their ability to indemnify anything is Nicholas Cambio's self-serving, unsubstantiated statement regarding his net worth. Based on the evidence, I find that this indemnity would not have been a sufficient inducement for Stephen Block to personally assume a $1.8 million liability. There has to be a better reason, and I find that that reason would be a piece of the action in the project.

Most of Mr. Cambio's testimony, which is in direct conflict with or inconsistent with the hard evidence, including documents prepared by his own lawyers, is neither persuasive nor credible. Accordingly, his testimony is rejected in all important respects, even where it is undisputed. Below are some of the inconsistencies between what Cambio says, what the documents show, and what can be accepted as reasonable:

(1) Cambio states that when the Property was purchased in May 1986, everyone knew that UPG was the real party in interest, and that the conveyance by Cambio, Feingold and Block to UPG via the unrecorded deed was merely to conform with everyone's expectations and intentions. UPG, however, was not incorporated until March 1987, almost one year *after* the purchase of the Property. *See* Trustee's Exhibit F.

(2) On August 18, 1986, Stanley Cantor of Adler, Pollock & Sheehan drafted the indemnity agreement purporting to set forth the "real deal" regarding the Property. Cantor states on behalf of Nicholas Cambio, Vincent Cambio, and Roney Malafronte that: "Title to the Real Estate is in the names of Nicholas E. Cambio, Steven Feingold, and Stephen D. Block as tenants in common, but notwithstanding same, you both acknowledge that same was done as a convenience to me and my brother Vincent Cambio and Roney Malafronte (we three are the real owners of the Real Estate) ..." Defendants' Exhibit 12. There is no mention of UPG.[4]

(3) Cambio testified about a prior development venture in which he and Block were involved—the Summit Plaza in Warwick, Rhode Island, wherein Block and eleven others each invested $5,000. At the end of the project, Block and the others received $50,000 to $60,000. He claimed that the Martha's Vineyard project was not similar to the Summit Plaza deal as an investment opportunity because Block was merely purchasing two lots in Martha's Vineyard. But UPG's/Cambio's attorney, Edward Maggiacomo described the Martha's Vineyard transaction as follows:

In 1986, Nick [Cambio] negotiated on behalf of Universal to purchase Vineyard II Acres for development. He offered an *investment opportunity* to your client, Stephen Block and Steven M. Feingold... both of whom had been investors in previous Universal developments. In fact, one such development had just recently been conducted successfully and the two Steves agreed to roll over their profit into this new venture. (Emphasis added.)

---

3. Given the wording of the agreement, it is inconceivable that Nicholas Cambio would not raise as a defense to a claim thereunder that only Vincent Cambio and Roney Malafronte were liable under the agreement.

4. While Nicholas Cambio's interchangeable references to UPG and the three principals of UPG may be excusable, such latitude is not warranted when the statements come from his attorneys.

Trustee's Exhibit E; *See also* Trustee's Exhibit G, Complaint for Declaratory Judgment, p. 2, ¶ 9. This letter and Cambio's own pleading in this adversary proceeding suggest that this venture was more than similar to Summit Plaza, indeed it was identical, and confirms that Block did in fact invest $50,000 as originally required by rolling his Summit Plaza profit into the Martha's Vineyard project. This belies Cambio's contention that Block intended to purchase only two lots and had paid only $10,000 into the Martha's Vineyard project;

(4) Even after he allegedly conveyed his interest to UPG via the deed dated December 30, 1988, Block continued to sign various documents as a joint tenant, held himself out as the owner of a fee simple interest in the Property, and on February 10, 1989, Block, Feingold, and Cambio executed an amendment to the promissory note held by RICCU, giving a secured interest in the Property. *See* Trustee's Exhibit H. If Block really had no interest in the Property, as Cambio argued, this would have been the time to remove him from the note and to add UPG as the obligor, but that did not happen. Instead, on May 30, 1989, the same three individuals executed a Settlement Agreement with Title USA Insurance Corporation of New York regarding title disputes over the Property. *See* Trustee's Exhibit I. As part of the Settlement Agreement, Cambio, Block and Feingold waived certain claims arising out of the original title policy on the Property; they gave Title USA a second mortgage on the Property; and they gave Title USA an option to purchase the Property for $2 million. *See* Exhibit I. In addition, on July 26, 1995, Cambio and Block granted DEPCO a mortgage on the Property wherein they represented and warranted that they had "good, marketable, fee simple title to the Mortgaged Property" and that they had "full power and lawful authority to sell, convey, transfer and mortgage" the Property. *See* Defendants' Exhibit 8, p. 4 ¶ 1(a). Block's actions throughout are not those of a person with no interest in the property.

Based on the evidence, it is clear to this Court that Block possessed a one-half undivided legal and equitable interest in the Property as of the date of the filing of this case, and I reject as completely unreasonable the suggestion that Block would obligate himself personally on a $1.8 million note, pay $50,000 or $60,000, and appear as a one-third owner of the Property as "a matter of convenience," only. It is just as ludicrous to say that Block would agree to remain liable on the $1.8 million RICCU note because it was "too late to change the documents." These assertions and Cambio's rendition of what the parties agreed to regarding the Martha's Vineyard Property are devoid of reality, not worthy of belief, and are rejected completely.

Cambio also testified that he showed the Property to fifteen or twenty other people, and that Block and Feingold were no different than any other persons who were interested only in purchasing lots. The record shows, and I find that Block and Feingold are clearly different from other potential lot purchasers, for at least three reasons: they were record owners of the Property; they were signatories on all the major documents regarding this Property; and they were personally liable to RICCU in the amount of $1.8 million. The suggestion that Block and Feingold were no different than the 20 or so others who may have[5] looked at the Property is absurd.

The Defendants cite to *In re Belba*, 226 B.R. 738 (Bankr.D.Mass.1998), to support their argument that the Trustee has no interest in this Property. That case is distinguishable and is no help to Cambio/UPG. *Belba* involved a partnership of three individuals who purchased real property in New Hampshire. *Id.* at 740. The partners took title to the Property as tenants in common, but the deed made no mention of the partnership. *Id.* When the

***

5. Cambio produced no record of these alleged 15 or 20 showings.

real estate market declined, the Partners began to liquidate their holdings and dissolve the partnership. *Id.* With one parcel left, the partners agreed to convey their interests to one partner, Pedone, whose capital contribution to the partnership exceeded that of the other partners. *Id.* Before the deed was recorded, one of the partners filed bankruptcy. *Id.* Although the bankruptcy court held that the trustee, using the strong-arm powers of Section 544, could avoid the transfer to Pedone because the deed was unrecorded, *id.* at 746, under New Hampshire partnership law, the trustee stood in the debtor's place with regard to the agreement to dissolve the partnership. *Id.* Because of the partners' agreement to liquidate a partnership asset by transferring the real estate to Pedone, no practical purpose was served by avoiding the deed which accomplished that task, and for that reason, the court denied the trustee's request to avoid the unrecorded deed. *Id.* With no such partnership issues in the case at bench, *Belba* is not applicable.[6]

■ Finally, we address UPG's contention that it relied to its detriment on the Trustee's letter dated June 16, 1998, Defendants' Exhibit 9, stating that he had no interest in the Property and considered "this issue... relating to the Massachusetts property, closed." The Trustee testified that at the time of sending the letter he was mistaken in his belief, and had overlooked his strong-arm powers under Section 544(a). Nine months later the Trustee recanted, and on March 19, 1999, formally reversed his position. *See* Defendants' Exhibit 10.

■ For UPG to succeed on its equitable estoppel argument, it must show that such reliance caused it to change its position for the worse. *See Lutz Engineering*

Co. v. Industrial Louvers, Inc., 585 A.2d 631, 637 (R.I.1991).

The indispensable elements of equitable estoppel, or estoppel in pais, are: "first, an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon; and secondly, that such representation or conduct in fact did induce the other to act or fail to act to his injury."

*Providence Teachers Union v. Providence School Bd.,* 689 A.2d 388, 391–92 (R.I.1997) (*quoting Lichtenstein v. Parness,* 81 R.I. 135, 138, 99 A.2d 3, 5 (R.I.1953)). Furthermore, "[t]he key element of an estoppel is *intentionally induced prejudicial reliance.*" (Emphasis added.) *East Greenwich Yacht Club v. Coastal Res. Mgmt. Council,* 118 R.I. 559, 568, 376 A.2d 682, 686 (1977) (*citing Raymond v. B.I.F. Indus., Inc.,* 112 R.I. 192, 198–99, 308 A.2d 820, 823 (1973)).[7]

Cambio testified that after he received the Trustee's letter he continued trying to sell the Property. He also claims that he lost $250,000 and various other sums that he could not quantify, that he continued to develop the land, and that "he spent thousands on attorneys and other professionals." On cross examination, it was revealed that the $250,000 was the amount paid to a secured creditor to stop a foreclosure, well before the Trustee's June 16, 1998 letter. The rest of Mr. Cambio's alleged detrimental reliance is vague, completely unsubstantiated, and is also rejected. *See National Chain Co. v. Campbell,* 487 A.2d 132, 134–35 (R.I.1985); *In re Newport Offshore, Ltd.,* 155 B.R. 616, 620 (Bankr.R.I.1993), *aff'd* 24 F.3d 353 (1st Cir.1994) (damages must be proven with a

---

6. Significant in *Belba,* however, is the court's advice that Section 544 does apply in unrecorded deed cases. 226 B.R. at 745–46.

7. This Court also feels that the Trustee's intent and state of mind in June 1998 have a bearing on whether he should be equitably

estopped from changing his position. Wallick had no improper motive—he was simply mistaken, and the correction of said mistake is not a ground for equitable estoppel on the facts here.

---

reasonable degree of certainty). Cambio also failed to explain how he came to rely on the letter in question.[8] For these reasons, UPG's equitable estoppel argument is rejected.

█ Regarding the Trustee's request to sell the Property under § 363(h), the statute provides:

> Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—
>
> (1) partition in kind of such property among the estate and such co-owners is impracticable;
>
> (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;
>
> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>
> (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

11 U.S.C. § 363(h). The parties have stipulated that the requirements of subsections 1, 2 and 4 of Section 363(h) are satisfied, if it is determined that the bankruptcy estate has an interest in the Property. *See* Joint Pre-trial Order, p. 3, ¶¶ 28–30. Since we have made that determination, the only remaining issue is whether the benefit to the estate from a sale under § 363 outweighs the detriment, if any, to the co-owner. Cambio testified that he had a purchaser and that he expected to net $2.5 million from the sale. Under these circumstances I find that there is little or no detriment to Cambio from a Section 363 trustee's sale, and that any prejudice would clearly be outweighed by the benefit to the estate from such a sale. Accordingly, the Trustee's motion to sell under Section 363(h) is GRANTED, and he is authorized to market and sell the Property [9] and to allocate the costs of sale between the co-owners. *See* 11 U.S.C. § 363(j).

For the reasons set forth above, the relief requested by the Trustee is GRANTED as to all three Counts of his Complaint, A.P. No. 99–1054. The relief sought in Universal Properties Group, Inc.'s Declaratory Judgment Complaint against the Trustee is DENIED in all respects, and judgment shall enter in favor of the Trustee on all four Counts of UPG's Complaint, A.P. No. 99–1055.

Enter judgment consistent with this Opinion.

---

8. The letter was not addressed to Cambio, UPG, or their attorney, and there is a large hole in the record as to how and *when* Cambio became aware of the letter. The Court treats this part of Cambio/UPG's claim as an afterthought.

9. While this decision was under advisement and in draft form, it was learned that on December 1, 2000, Cambio/UPG had in fact sold the Property to a third party and netted $3.9 million from the sale.